# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### Assigned on Briefs September 15, 2015

## STATE OF TENNESSEE v. MICHAEL LEBRON BRANHAM

### Appeal from the Criminal Court for Hamilton County
#### No. 283593    Barry A. Steelman, Judge

___

### No. E2014-02071-CCA-R3-CD – Filed January 8, 2016

___

Following a jury trial, the Defendant, Michael Lebron Branham, was convicted of aggravated robbery, a Class B felony; aggravated assault, a Class C felony; coercion of a witness, a Class D felony; aggravated burglary, a Class C felony; and employment of a firearm during the commission of a dangerous felony, a Class C felony. Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(iii), -13-402(a)(1), -14-403, -16-507, -17-1324(b)(1). The trial court imposed a total effective sentence of twenty-nine years. On appeal, the Defendant contends (1) that this case should be remanded for a new trial because one of the prosecutors had previously represented the Defendant in an unrelated matter; (2) that the indictments for aggravated burglary and employing a firearm during the commission of a dangerous felony should be dismissed due to alleged vindictive prosecution; (3) that the trial court erred in not severing the coercion of a witness charge from the other offenses; (4) that the Defendant's convictions for aggravated burglary and aggravated assault violate the constitutional protection against double jeopardy as those offenses "were incidental to the aggravated robbery"; (5) that the State failed to make a proper election of offenses with respect to the coercion of a witness charge; (6) that the trial court erred in setting the length of the Defendant's sentences; and (7) that the trial court erred in imposing partial consecutive sentences.[1] Following our review, we affirm the judgments of the trial court.

### Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed

D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and ALAN E. GLENN, JJ., joined.

___

[1] For the purpose of clarity, we have renumbered and reordered the issues as stated by the Defendant in his appellate brief.

Andrew W. Childress, Chattanooga, Tennessee (at trial); and Donna Miller, Chattanooga, Tennessee (at motion for new trial hearing and on appeal), for the appellant, Michael Lebron Branham.

Herbert H. Slatery III, Attorney General and Reporter; Nicholas W. Spangler, Assistant Attorney General; M. Neal Pinkston, District Attorney General; and Lance Pope and David Schmidt, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

FACTUAL BACKGROUND[2]

*I. Trial*

Regika Tillery testified that she lived in the Emma Wheeler Homes housing development in Chattanooga. Ms. Tillery testified that on the evening of March 10, 2011, she was watching a basketball game with her boyfriend, Reginald Hubbard, and three friends. Ms. Tillery admitted that Mr. Hubbard and her friends were smoking marijuana that evening but denied that she had been because she was nine months pregnant at that time. Ms. Tillery recalled that sometime between 6:00 and 7:00 p.m. she received a phone call from a friend, Shondrika Jones.

According to Ms. Tillery, Ms. Jones called her because one of Ms. Jones's children had left a "hair bow box" at her house, and she asked Ms. Tillery to give the box to the Defendant. Ms. Tillery testified that she "knew [the Defendant] through [Ms. Jones]" and had "seen him a couple of times with her." Ms. Tillery further testified that she did not really know the Defendant and denied having ever "part[ied] with him" or smoked marijuana with him.

According to Ms. Tillery, she "went outside to go walk down the street and get a cigarette" after she got off the phone with Ms. Jones. Ms. Tillery testified that as she "was walking back up to the house, [the Defendant] pulled up in a vehicle and jumped out with a gun." Another man "jumped from the back seat with a gun." Ms. Tillery recalled that the Defendant parked the vehicle parallel to her door and blocked the two "parking spaces" in front of her home.

Ms. Tillery testified that when the Defendant got out of the car, he said, "Where it's at? Give it to me. You know what this is." Ms. Tillery further testified that the

---

[2] The factual background of the Defendant's procedural issues will be discussed in more detail in other portions of this opinion.

-2-

Defendant then put the gun to her back and said, "Come on, fixing to walk you back in this house and you fixing to give me the money." According to Ms. Tillery, the Defendant "started walking [her] toward [her] house." Ms. Tillery recalled that the gun the Defendant used was "pretty big" and looked like a TEC-9. Ms. Tillery testified that she felt "[s]cared, nervous, everything" when the Defendant put the gun to her back.

When they entered the house, the Defendant approached Mr. Hubbard, pointed the gun at him, and asked him "where the money was at." Ms. Tillery testified that the Defendant made Mr. Hubbard get up and "pushed him" into the kitchen until he was against a wall. The Defendant told Mr. Hubbard that "[h]e was going to blow his brains out if he didn't give [the Defendant] the money." The other man kept his gun pointed at Ms. Tillery's friends while the Defendant threatened Mr. Hubbard. Mr. Hubbard pulled some money out of his pockets and gave it to the Defendant.

Ms. Tillery testified that the Defendant and the other man left after Mr. Hubbard gave his money to the Defendant. Ms. Tillery further testified that she "went out the door behind" the men and said that she was calling the police. According to Ms. Tillery, the Defendant replied, "So what, bitch." Ms. Tillery then watched as the men "hopped in the car and pulled off." Ms. Tillery's 911 call was played for the jury.

During the call, Ms. Tillery was asked if anything was taken from her, and she responded, "[S]ome money." Ms. Tillery insisted at trial that nothing was taken directly from her and that she was referring to the money taken from Mr. Hubbard. Ms. Tillery admitted at trial that the men also took a "little bag of marijuana off the table" while they were in her house. Ms. Tillery testified that she did not know why she failed to tell the 911 operator about the marijuana. Also during the call, Ms. Tillery stated that she went outside after the Defendant called her and told her to come out of the house. However, Ms. Tillery testified that no one called her to come outside and opined that she told the 911 operator that because she "probably wasn't thinking because [she] was so" distraught.

Ms. Tillery estimated that approximately twenty minutes passed between her 911 call and when the first officers from the Chattanooga Police Department (CPD) arrived at her house. While the officers were there, Ms. Tillery received a phone call from the Defendant. Ms. Tillery testified that the Defendant threatened her and asked her if she had called the police. When she said that she had, the Defendant told her that "it was going to get serious." Ms. Tillery testified that she understood the Defendant's statement to mean that "he was going to try to harm" her for calling the police.

Ms. Tillery also testified that the Defendant continued to threaten her by "[s]ending people and telling people that he [was] going to do stuff to [her] if [she] [came] to court." Ms. Tillery explained that the Defendant had sent her cousin,

"Flubber," to talk to her about not testifying. Ms. Tillery testified that the Defendant and Flubber knew each other because they were "both in gangs." Ms. Tillery also testified that Flubber's "baby mama," Cordesia, told her that the Defendant said he would "pay [her] not to come to court, but if [she did] come to court, that something was going to happen to [her] for coming to court." Ms. Tillery testified that she took these threats seriously and that she was afraid of the Defendant.

The State introduced three recordings of phone calls made by the Defendant from jail on October 31, 2011, January 9, 2012, and March 11, 2012. In the October 2011 phone call, the Defendant stated that he had "done hollered at Cordesia on that" when the other caller mentioned seeing Ms. Tillery. The Defendant then stated, "Cordesia is supposed to be on that s--t." Ms. Tillery testified that she believed that this referred to Cordesia "[t]rying to get [her] not to come to court."

In the January 2012 phone call, the Defendant told the other caller to "[s]end word [to Ms. Tillery] through Cordesia" and stated that "Cordesia knows what's up." Ms. Tillery testified that she believed that this referred to the fact that Cordesia "had already [come] to [her] before then telling [her] what [the Defendant] said." In the March 2012 phone call, Flubber told the Defendant that he did not know Mr. Hubbard and that he was only worried about Ms. Tillery. The Defendant then asked Flubber "about his end . . . being straight." Ms. Tillery testified that she believed they were referring to her.

Ms. Tillery admitted that she had a prior conviction for attempted theft which she explained arose when she "[p]layed with [a] police bike." Ms. Tillery also admitted that she had previously used marijuana. Ms. Tillery acknowledged that Mr. Hubbard had a "criminal background" and that he used marijuana. Ms. Tillery denied making "this whole thing up" in order to avoid admitting that the incident was a drug deal gone bad and chastised trial counsel for "[a]sking these dumb-ass questions."

On cross-examination, Ms. Tillery clarified that her friends had been at her house "for a couple hours" before the Defendant arrived and that one of her friends, "Bug," did not actually use any marijuana because "she a child." Ms. Tillery insisted that she was scared during the incident and explained that she "wasn't thinking" when she ran after the Defendant and the other man as they left.

Mr. Hubbard testified that he had a child with Ms. Tillery and that he was currently serving a sentence for aggravated robbery. Mr. Hubbard testified that he was not incarcerated on March 10, 2011. Mr. Hubbard then refused to answer any more questions, stating that he had "nothing to say" and that he would "rather plead the Fifth." Mr. Hubbard denied that he was refusing to testify because he was scared, stating that he "just [did not] want to." Mr. Hubbard was instructed by the trial court that if he refused

to testify he could be found in contempt. Mr. Hubbard continued to refuse to answer any questions.

At that point, Mr. Hubbard was declared unavailable, and his preliminary hearing testimony from June 2011 was introduced into evidence. At the preliminary hearing, Mr. Hubbard testified that on March 10, 2011, he was "sitting on [his] couch" watching a basketball game with some friends and smoking marijuana when "the door swing open and a machine gun came around the corner." Mr. Hubbard testified that he knew the Defendant, that the Defendant was holding the "machine gun," and that the Defendant was not wearing a mask or attempting to conceal his identity.

Once inside the house, the Defendant demanded money from the victims. Mr. Hubbard testified that the Defendant said, "Give me the money, give me the money, y'all know what it is, give me the money." The Defendant then took Mr. Hubbard into the kitchen and put a gun to his head. Mr. Hubbard testified that the Defendant said, "Give me the money or I'm going to spray you." Mr. Hubbard fumbled with his pockets until he produced approximately $200 that he had just been paid by his employer. Mr. Hubbard testified that the Defendant and the other armed man fled after he gave the money to the Defendant.

Mr. Hubbard further testified that Ms. Tillery "chased [the men] out the door" and that he grabbed her and pulled her back into the house while the men "just zoomed off." Mr. Hubbard noted that the Defendant was driving Ms. Jones's car. Mr. Hubbard testified that Ms. Tillery immediately called the police. According to Mr. Hubbard, the Defendant called Ms. Tillery shortly after the incident and asked her if she had called the police. Ms. Tillery told the Defendant that she had, and the Defendant "said a few cuss words" and then said, "It's going to get real crucial for y'all if y'all go to court and testify against me."

Mr. Hubbard testified that a few days later the Defendant called and offered $500 for them "not to come to court" and that after he realized they were not "going to take his $500, he made some threatening, more threatening" remarks. Mr. Hubbard denied selling marijuana generally and specifically denied selling marijuana to the Defendant. Mr. Hubbard denied that the Defendant had called his phone on March 10, 2011, and stated that the Defendant had only called Ms. Tillery's phone that day.

Calesia Morris testified that she was at Ms. Tillery's home on March 10, 2011, watching a basketball game when Ms. Tillery "got up to go outside." Ms. Morris testified that when Ms. Tillery returned, there were "two dudes behind her with guns, and they was telling everybody to lay down and give them everything that [they] had." Ms. Morris "was just looking down" and told the men she did not have anything to give them. Ms. Morris testified that she was "too scared to move" and just sat on the couch. One of

the men went to Mr. Hubbard, and Ms. Morris saw Mr. Hubbard take some money out of his pocket and give it to the man.

Ms. Morris testified that the men "ran on out the door" after they got Mr. Hubbard's money and that Ms. Tillery chased after them, saying that she was going to call the police. Ms. Morris admitted that she had used marijuana that day but denied that Ms. Tillery had. Ms. Morris further denied that Ms. Tillery and Mr. Hubbard sold marijuana. Ms. Morris testified that she could not identify the two men because she "was too scared to remember how they look[ed]." Ms. Morris also testified that she never gave a statement to the police.

Alan Lamar Jordan testified that he was also at Ms. Tillery's house on March 10, 2011, watching a basketball game. Mr. Jordan recalled that Ms. Tillery "received a phone call" and went outside. When Ms. Tillery returned, "there was a light skinned dude had a gun to her head, and there was another dark skinned dude with dreads, he followed in behind them and come over to [him]." Mr. Jordan testified that Ms. Tillery had a "facial expression" like "[o]h my God . . . . He got a gun to my head[,] [w]hat's going to happen," when she entered the house.

Mr. Jordan testified that the men were saying, "Lay it down, lay it down." The man "with the dreads" was pointing his gun at Mr. Jordan, and Mr. Jordan told him that he did not have anything. Mr. Jordan testified that he took his wallet out to show the man there was nothing inside it. Mr. Jordan further testified that the man who had his gun pointed at Ms. Tillery's head had "a big gun." That man took Mr. Hubbard into the kitchen, and Mr. Jordan heard the man ask Mr. Hubbard, "What's in your pocket." Mr. Jordan testified that the men then "just left."

Mr. Jordan admitted that he could not identify the two men, stating that he had "never seen them before." Mr. Jordan also admitted to smoking marijuana that day. Mr. Jordan further testified that everyone in the house, including Ms. Tillery, had used marijuana that day. However, Mr. Jordan denied that either Mr. Hubbard or Ms. Tillery sold marijuana.

Detective Jacques Weary of the CPD testified that he was the lead investigator in this case. Det. Weary testified that when he arrived, Ms. Tillery was distraught, upset, angry, and "still scared." Ms. Tillery told Det. Weary, "as soon as [he] walked through the door," that the Defendant had "robbed her." Det. Weary testified that he spoke to all of the victims, including Ms. Morris. Det. Weary recalled that the home smelled of marijuana and that he initially suspected that "maybe there [were] some drug sales happening." However, Det. Weary testified that after speaking to the victims, he believed that "there were no drug sales happening" at Ms. Tillery's home. Ms. Tillery did tell him that the men took a bag of marijuana from the house.

Det. Weary testified that while he was interviewing the victims, Ms. Tillery received a phone call from the Defendant. Ms. Tillery put her phone "on speaker phone," and Det. Weary overheard the Defendant say, "You were wrong for calling the police. I'm going to tell them that this was a drug deal gone bad. If you, if you go through with it, it's going to get serious." At that point, Det. Weary took the phone and said the Defendant's name. The Defendant responded, "Yeah," and told Det. Weary that "it was a drug deal gone bad" and that he had just taken "some marijuana from them." Det. Weary testified that he offered to have the Defendant come to his office and explain his side of the incident, but the Defendant never did.

Based upon the foregoing, the jury convicted the Defendant of aggravated robbery regarding Mr. Hubbard, a Class B felony; aggravated assault regarding Ms. Tillery, a Class C felony; coercion of a witness regarding Ms. Tillery, a Class D felony; aggravated burglary of Ms. Tillery's home, a Class C felony; and employment of a firearm during the commission of a dangerous felony regarding the aggravated burglary, a Class C felony. Tenn. Code Ann. §§ 39-13-102(a)(1)(A)(iii), -13-402(a)(1), -14-403, -16-507, -17-1324(b)(1).

## II. Sentencing Hearing

The Defendant's presentence report revealed that the Defendant had three prior felony convictions for theft, evading arrest, and aggravated assault in addition to misdemeanor convictions for assault, simple possession of cocaine, evading arrest, "joyriding," criminal trespass, and vehicular assault. The Defendant also had a federal conviction for possession of a firearm by a convicted felon. The Defendant reported that he had been adjudicated delinquent as a juvenile for "auto burglary," "auto theft," attempted robbery, theft, evading arrest, and disorderly conduct. However, the Defendant's juvenile records were not reviewed due to his age. In addition to his prior convictions, the Defendant had his state probation revoked on two prior occasions and his federal probation revoked once.

The Defendant stated in the presentence report that he went to Ms. Tillery's house to buy marijuana but that he did not intend to pay for it. The Defendant stated that he "requested a large amount, let the dealer weigh it, [and] then told the dealer he had left his money in the car." The Defendant claimed that "the dealer" let him take the marijuana to his car and that he drove away, "at which time the dealer called the police to report a robbery." The presentence report also reflected that on June 8, 2011, the Defendant "was verified by the Hamilton County Sheriff's Office as a member of the 'Rollin' 60s' Crips."

The Defendant's sister, Darlisha Simmons, testified that she believed the Defendant, if placed on supervised release, would "[get] it together" because he had a

daughter he wanted to care for. The Defendant's mother, Kathy Johnson, testified that the Defendant was diagnosed with attention deficit hyperactivity disorder as a child. Ms. Johnson further testified that the Defendant was a "good person" and wanted to "be there" for his daughter. The Defendant told Ms. Johnson that he "went to go purchase some weed from [Ms. Tillery] and she tried to beat him and he just took it and walked away." Ms. Johnson admitted that the Defendant had his first case transferred to criminal court when he was fifteen.

The Defendant testified that he went to Ms. Tillery's house alone and without a gun to steal marijuana from her. The Defendant denied ever speaking to Det. Weary and claimed that he offered to turn himself in to another police officer but decided not to when he found out that a warrant had been issued for him because it was the officers' job "to come get [him]." To the extent that his testimony differed from the testimony at trial, the Defendant claimed that all of the witnesses at trial had lied. The Defendant also claimed that most of his prior convictions and probation revocations were not as serious as they seemed and also claimed that some of his convictions were errors and should not have been on his record. The Defendant admitted to being in a gang when he was "younger" but denied that he was still involved in it. The Defendant further admitted that he sometimes went by "M-60" and that he had a tattoo on his right hand that said "rolling." The Defendant testified that he wanted to leave the state so he could be with his daughter.

In sentencing the Defendant, the trial court discussed several things under the "catch-all" mitigating factor. See Tenn. Code Ann. § 40-35-113(13). The trial court noted the Defendant's "home life," the fact that he grew up "without a father," and his diagnosis of attention deficit hyperactivity disorder as a child. The trial court further noted that the Defendant earned his G.E.D. while in federal prison. The trial court also acknowledged that no one was harmed during the offenses. The trial court stated that the Defendant was "educated and smart." The trial court acknowledged the Defendant's desire to be with his daughter and "to really become involved in her life." The trial court stated that it considered "all of these factors as mitigating factors."

For all of the offenses, the trial court found that the Defendant had a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range, and that the Defendant, before trial or sentencing, had failed to comply with the conditions of a sentence involving release into the community. See Tenn. Code Ann. § 40-35-114(1), (8). For the aggravated robbery, aggravated assault, and the aggravated burglary convictions, the trial court also found that the Defendant had no hesitation about committing a crime when the risk to human life was high. See Tenn. Code Ann. § 40-35-114(10). The trial court concluded that the applicable enhancement factors "significantly outweigh[ed] the mitigating factors."

-8-

The Defendant was classified as a Range I, standard offender for the aggravated robbery conviction and as a Range II, multiple offender for his convictions of aggravated assault, coercion of a witness, aggravated burglary, and employment of a firearm during the commission of a dangerous felony. The trial court sentenced the Defendant to eleven years for the aggravated robbery conviction; nine years for the aggravated assault, the aggravated burglary, and the employment of a firearm convictions; and six years for the coercion of a witness conviction.

The trial court imposed partial consecutive sentences based upon the Defendant's extensive record of criminal activity. See Tenn. Code Ann. § 40-35-115(b)(2). The trial court ordered the Defendant's sentences for aggravated assault, coercion of a witness, and aggravated burglary to be served concurrently with each other but consecutively to the sentence for the Defendant's aggravated robbery conviction. The trial court ordered the Defendant's sentence for employment of a firearm during the commission of a dangerous felony be served consecutively to his sentence for aggravated burglary, noting that consecutive sentencing was statutorily mandated. See Tenn. Code Ann. § 39-17-1324(e)(1). In total, the trial court imposed an effective sentence of twenty-nine years.

### III. Motion for New Trial Hearing

At the motion for new trial hearing, the Defendant was represented by a new attorney. In his amended motion for new trial, the Defendant raised the issue that one of the prosecutors, Assistant District Attorney General (ADA) David Schmidt, had represented the Defendant in an unrelated criminal case several years prior to this case. The Defendant's attorney acknowledged that trial counsel was aware of this fact, that trial counsel never objected to ADA Schmidt's participation in the prosecution, and that the issue was not brought to the trial court's attention until the Defendant filed his amended motion for new trial.

The Defendant testified that in 2007, ADA Schmidt represented him in an assault case. The Defendant explained that he had assaulted a fellow inmate while he was incarcerated in the county jail and that prison officials had deemed the offense "gang-related." The Defendant admitted that the assault was never brought up during his trial in this case. However, the Defendant testified that he believed ADA Schmidt became "aware that [he] was a validated member of a gang" due to their attorney-client relationship and complained that the assault conviction was used by the State to enhance his sentences in this case.

ADA Schmidt testified that he began working for the District Attorney General's Office in December 2009, and that prior to that, he had been in private practice in Hamilton County. ADA Schmidt testified that he did not realize the Defendant was a former client until the Defendant filed his amended motion for new trial. ADA

Schmidt's billing sheet for the Defendant's assault case reflected that he only spent 1.1 hours representing the Defendant. ADA Schmidt testified that he became involved in this case "a couple of months prior to trial" and that his prior representation of the Defendant played no role in this case. ADA Schmidt further testified that his prior representation of the Defendant was not how he learned that the Defendant was a gang member. ADA Schmidt also denied that his prior representation of the Defendant had any role in the Defendant's re-indictment.

The trial court issued a general denial of the Defendant's motion for new trial without making any specific findings of fact or conclusions of law regarding this issue. This timely appeal followed.

## ANALYSIS

### I. Disqualification of ADA Schmidt

The Defendant contends that this case should be remanded for a new trial because ADA Schmidt had previously represented the Defendant in an unrelated matter. The Defendant argues that ADA Schmidt "learned through that representation of [the] Defendant's involvement in a gang" and that "there was no evidence of any other way in which ADA Schmidt had learned of [the] Defendant's alleged gang involvement." The Defendant further argues that ADA Schmidt used that information to "deliberately [solicit] extremely prejudicial testimony from [Ms.] Tillery that [the Defendant] was in a gang." The Defendant also argues that the prior assault conviction was "used against him at sentencing." The State responds that the Defendant has waived this issue by failing to raise an objection prior to trial and that plain error review of this issue is not warranted.

The Defendant raised this issue for the first time in his amended motion for new trial. As such, he has waived full appellate review of the issue. See Tenn. R. App. P. 36(a) (stating that relief will not be granted "to a party responsible for an error or who failed to take whatever action was reasonably available to prevent or nullify the harmful effect of an error"). Therefore, we review this issue solely to determine if plain error review is warranted.

The doctrine of plain error applies only when all five of the following factors have been established:

(a) the record must clearly establish what occurred in the trial court;
(b) a clear and unequivocal rule of law must have been breached;
(c) a substantial right of the accused must have been adversely affected;
(d) the accused must not have waived the issue for tactical reasons; and
(e) consideration of the error must be "necessary to do substantial justice."

State v. Page, 184 S.W.3d 223, 230-31 (Tenn. 2006) (quoting State v. Terry, 118 S.W.3d 355, 360 (Tenn. 2003)) (internal brackets omitted). "An error would have to [be] especially egregious in nature, striking at the very heart of the fairness of the judicial proceeding, to rise to the level of plain error." Id. at 231.

Here, plain error review is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Page, 184 S.W.3d at 230. Attorneys "cannot represent conflicting interests or undertake to discharge inconsistent duties." State v. Phillips, 672 S.W.2d 427, 430 (Tenn. Crim. App. 1984) (quoting Autry v. State, 430 S.W.2d 808, 809 (Tenn. Crim. App. 1967)). To that end, "[w]hen an attorney has once been engaged and received the confidences of his client, he cannot enter the services of those whose interests are adverse to that of his client or former client." Id. In criminal cases, "[a]n attorney cannot be permitted to participate in the prosecution . . . if, by reason of his professional relation with the accused, he has acquired knowledge of facts upon which the prosecution is predicated, or which are closely interwoven therewith." Id. at 430-31.

ADA Schmidt represented the Defendant in an unrelated matter some five years prior to the trial in this case. ADA Schmidt only spent 1.1 hours representing the Defendant on an assault charge and testified that he did not recall representing the Defendant until the issue was raised in the Defendant's motion for new trial. The Defendant argues that during the prior representation, ADA Schmidt acquired knowledge of facts "closely interwoven" with this case, chiefly the Defendant's gang affiliation. However, there is significant evidence that the Defendant's gang affiliation was public knowledge by the time of his trial in this case.

The Defendant "was verified by the Hamilton County Sheriff's Office as a member of the 'Rollin' 60s' Crips" in June 2011. During an objection to Ms. Tillery's testimony about the Defendant and Flubber both being gang members, trial counsel stated that he "had an inclination" that Ms. Tillery would testify that the Defendant was a gang member. Later, trial counsel objected to a portion of Mr. Hubbard's preliminary hearing testimony from June 2011, in which Mr. Hubbard testified that the Defendant was in a gang. That portion of the testimony was redacted and not provided to the jury. Furthermore, the Defendant testified at the sentencing hearing that he had been in a gang when he was "younger," that he sometimes went by "M-60," and that he had a tattoo on one of his hands which read, "rolling."

This case is similar to State v. Tina M. Dixon, in which the defendant alleged she was denied due process because the prosecutor had represented her on two prior convictions and those convictions were used to enhance her sentences. No. M2010-02382-CCA-R3-CD, 2012 WL 2356523, at *13 (Tenn. Crim. App. June 21, 2012). A panel of this court concluded that the trial court did not err in denying the defendant's

motion to disqualify the prosecutor because, similar to the case at hand, there was no evidence that the prosecutor even remembered having previously represented the defendant "eighteen years before the current prosecution" and there was no evidence "that the prosecutor obtained information through her previous representation that had any bearing on [the current] convictions." Id. at *14. Accordingly, we conclude that plain error review of this issue is not warranted.

## II. Vindictive Prosecution

The Defendant contends that the indictments for aggravated burglary and employing a firearm during the commission of a dangerous felony should be dismissed due to alleged vindictive prosecution. The Defendant alleges that those charges were "merely a ruse by the State . . . to expose the Defendant to greater sentencing and mandatory consecutive sentencing." However, the Defendant makes no argument that the State lacked probable cause to support the indictments and makes no allegation that the State's actions were a vindictive response to the Defendant choosing to exercise his constitutional rights. The State responds that the Defendant has waived full appellate review of this issue by failing to raise it prior to trial and that plain error review is not warranted.

A trial court "at any time while [a] case is pending, . . . may hear a claim that the indictment . . . fails to show jurisdiction in the court or to charge an offense." Tenn. R. Crim. P. 12(b)(2)(B). However, motions alleging other types of defects in the indictment or "alleging a defect in the institution of the prosecution" must be raised before trial. Tenn. R. Crim. P. 12(b)(2)(A), (B). Failure to do so waives the issue. Tenn. R. Crim. P. 12(f)(1). A claim of vindictive prosecution alleges a defect in the institution of the prosecution; therefore, it must be raised prior to trial. See Fed. R. Crim. P. 12(b)(3)(A)(iv).[3] The Defendant has waived this issue by failing to raise it prior to trial. As such, we review the issue solely to determine if plain error review is warranted.

Here, plain error review is not warranted because the Defendant has failed to establish that a clear and unequivocal rule of law was breached. Page, 184 S.W.3d at 230. "Allegations of prosecutorial vindictiveness or selective prosecution in the institution of a prosecution, have constitutional implications that, if proven, may warrant dismissal of the indictment." State v. Skidmore, 15 S.W.3d 502, 508 (Tenn. Crim. App. 1999) (citing Blackledge v. Perry, 417 U.S. 21, 27 (1974)). However, "as long as the prosecutor has probable cause to believe that an accused committed an offense, the

---

[3] This court, noting the similarity between the two rules, has previously relied upon federal case law interpreting Federal Rule of Criminal Procedure 12 in interpreting Tennessee Rule of Criminal Procedure 12. See State v. Nixon, 977 S.W.2d 119, 120-21 (Tenn. Crim. App. 1997).

determination whether to prosecute rests entirely within the prosecutor's discretion, subject to these constitutional limitations." Id.

The Defendant was originally indicted for aggravated robbery, aggravated assault, and coercion of a witness. A new indictment was filed shortly before trial adding the offenses of aggravated burglary and employment of a firearm during the commission of a dangerous felony. It is well settled that "'the initial charges filed by a prosecutor may not reflect the extent to which an individual is legitimately subject to prosecutions'" and that "an initial charging decision is not binding upon the State with respect to the future course of the prosecution." State v. Mann, 959 S.W.2d 503, 510 (Tenn. 1997) (quoting United States v. Goodwin, 457 U.S. 368, 382 (1982)). As the State had probable cause to believe that the offenses of aggravated burglary and employment of a firearm during the commission of a dangerous felony had been committed by the Defendant, the new indictment was not the product of prosecutorial vindictiveness. Accordingly, we conclude that plain error review of this issue is not warranted.

### III. Severance of the Coercion of a Witness Charge

The Defendant contends that the trial court erred by not severing the coercion of a witness charge from the other offenses. The Defendant argues that trying the coercion of a witness charge with the other offenses resulted "in extreme prejudice to [the] Defendant," improperly bolstered Ms. Tillery's credibility, and prevented "effective cross-examination of her testimony." The State responds that the Defendant has waived this issue by failing to file a pretrial motion to sever and that plain error review of this issue is not warranted.

A motion to sever must be filed prior to trial. Tenn. R. Crim. P. 12(b)(2)(E). Failure to do so waives the issue. Tenn. R. Crim. P. 12(f)(1). Here, the Defendant failed to file a pretrial motion to sever and raised this issue for the first time in his amended motion for new trial. Accordingly, we address this issue solely to determine if plain error review is warranted.

Here, plain error review is not warranted because the Defendant has failed to show that a clear and unequivocal rule of law has been breached. Page, 184 S.W.3d at 230. A panel of this court has previously held that a trial court did not err in denying a defendant's severance motion seeking to sever a coercion of a witness charge from the underlying offenses because "[e]vidence of efforts to avoid prosecution for a crime," such a coercing a witness to the crime, "is highly probative to establish the intent of a perpetrator." State v. Larry D. LaForce, II, No. E2007-00334-CCA-R3-CD, 2008 WL 538969, at *7 (Tenn. Crim. App. Feb. 27, 2008). Therefore, plain error review is not warranted because no clear and unequivocal rule of law has been breached.

-13-

*IV. Double Jeopardy*

The Defendant contends that his convictions for aggravated burglary and aggravated assault violate the constitutional protection against double jeopardy because those offenses "were incidental to the aggravated robbery." The Defendant argues that the aggravated assault of Ms. Tillery and the aggravated burglary of her home were "part of a single episode of aggravated robbery." In making this argument, the Defendant urges this court to compare the facts of this case with those of State v. White, 362 S.W.3d 559 (Tenn. 2012), and its progeny. The Defendant also argues, with respect to the aggravated burglary conviction, that the State failed to prove the required element that the Defendant entered the house with the intent to commit a theft because he "entered the Tillery residence to rob, not to commit theft." The State responds that the Defendant's convictions for aggravated robbery, aggravated assault, and aggravated burglary do not violate the prohibition against double jeopardy.

Both the United States and Tennessee Constitutions protect against a criminal defendant being placed in double jeopardy for the same offense. U.S. Const., amend. V; Tenn. Const. art. I, § 10. This protection includes: "(1) protection against a second prosecution for the same offense after acquittal; (2) protection against a second prosecution for the same offense after conviction; and (3) protection against multiple punishments for the same offense." State v. Watkins, 362 S.W.3d 530, 541 (Tenn. 2012). At issue here is the last of these protections, protection against multiple punishments for the same offense, specifically a "multiple description claim."

Multiple description claims "arise in cases in which defendants who have been convicted of multiple criminal offenses under different statutes allege that the convictions violate double jeopardy because the statutes punish the 'same offense.'" Watkins, 362 S.W.3d at 544. As such, we are tasked with determining whether the Defendant committed multiple offenses or only one. Id. In doing so, we apply the test announced in Blockburger v. United States, 284 U.S. 299 (1932). Id. at 556 (adopting the Blockburger test).

The Blockburger test applies "where the same act or transaction constitutes a violation of two distinct statutory provisions" and requires examination of "whether each provision requires proof of a fact which the other does not." 284 U.S. at 304. Put another way, "[i]f each offense includes an element that the other offense does not, 'the Blockburger test is satisfied, notwithstanding a substantial overlap in the proof offered to establish the crimes.'" Watkins, 362 S.W.3d at 544 (quoting Iannelli v. United States, 420 U.S. 770, 785 n.17 (1975)).

"The Blockburger test involves a two-step process": (1) "the threshold inquiry . . . is whether the alleged statutory violations arise from 'the same act or transaction'"; and

(2) if they do, "a court next examines the statutes to determine whether the crimes of which the defendant was convicted constitute the same offense." Watkins, 362 S.W.3d at 545. If each statutory offense "includes an element not contained in the other, the offenses are distinct," and "the legislature is presumed to have intended to allow the offenses to be punished separately." Id. at 545-46. The question of whether multiple convictions violate double jeopardy is one of mixed law and fact, "which we review de novo without any presumption of correctness." Id. at 539.

At the outset, we reject the Defendant's request to compare this case with White and its progeny. The holding of White "was intended to address the due process concerns that arise when a defendant is charged with kidnapping a victim and other crimes, such as robbery, rape, or assault, that involve some inherent confinement of that victim." State v. Teats, 468 S.W.3d 495, 503 (Tenn. 2015). This court, reasoning that the precedent preceding White was "expressly limited to those cases involving the propriety of a separate conviction of kidnapping," has previously held that "[t]he same danger does not exist between the crimes of aggravated robbery and aggravated burglary." State v. Larry Jereller Alston, No. E2012-00431-CCA-R3-CD, 2013 WL 2382589, at *10 (Tenn. Crim. App. May 30, 2013), aff'd on other grounds, State v. Alston, 465 S.W.3d 555 (Tenn. 2015).

In previously rejecting an argument similar to the Defendant's and holding that separate convictions for aggravated robbery and aggravated burglary do not violate the principle of double jeopardy, this court has stated the following:

> The offenses of aggravated burglary and aggravated robbery "are narrowly defined by statute and each contains different elements." Aggravated burglary is a property crime that is complete upon the unauthorized entry into a habitation. The victim of aggravated burglary need not even be present when the offense is committed. Aggravated robbery, as charged, on the other hand, is a crime against the person complete upon the taking of property from another by putting in fear and use of a deadly weapon. A perpetrator need not make any entry into a habitation to complete the offense of aggravated robbery.

Alston, 2013 WL 2382589, at *10-11 (internal citations omitted). As such, the Defendant's argument with respect to his aggravated burglary and aggravated robbery convictions is without merit.

Regarding the Defendant's aggravated assault and aggravated robbery convictions, we note that "[i]f a defendant's multiple convictions arise under different statutes and . . . involve multiple victims, then the double jeopardy protection against multiple punishment is not implicated." Watkins, 362 S.W.3d at 554. Here, Ms. Tillery was the

victim of the aggravated assault and Mr. Hubbard was the victim of the aggravated robbery.

"[T]he proper unit of prosecution for robbery in Tennessee is the number of takings, i.e., the number of thefts." State v. Franklin, 130 S.W.3d 789, 797 (Tenn. Crim. App. 2003). Here, the evidence established that the Defendant only took money from Mr. Hubbard. However, contrary to the Defendant's argument, "[t]hat is not to say that the [Defendant is not] guilty of two crimes." Id. at 798. This court has previously held that a defendant can be convicted of both aggravated assault with respect to one victim and aggravated robbery with respect to a second victim when "each of the two victims was threatened with a gun during the course of the robbery." Id.; see also State v. James Carlos Ward, No. M2009-00417-CCA-R3-CD, 2010 WL 1949155, at *9 (Tenn. Crim. App. May 14, 2010) (citing Franklin and reaching the same result). Accordingly, the Defendant's challenge to his aggravated assault and aggravated robbery convictions is without merit.

We must also reject the Defendant's argument that the State failed to establish that he entered Ms. Tillery's home with the intent to commit a theft because he "entered the [home] to rob, not to commit theft." Robbery is statutorily defined as "the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-401(a) (emphasis added). "The element which distinguishes theft from robbery is the use of violence or fear." State v. Owens, 20 S.W.3d 634, 638 (Tenn. 2000). As such, when the Defendant entered Ms. Tillery's home "to rob," he did so with the intent to commit a theft by the use of violence or fear. The fact that this was the Defendant's intent is clear from the fact that he put a gun to Ms. Tillery's back and told her that he was going to walk her back into the house and she was "fixing to give [him] the money." Accordingly, we conclude that this argument is devoid of merit.

*V. Election of Offenses*

The Defendant contends that the State failed to make a proper election of offenses with respect to the coercion of a witness charge. The Defendant argues that the State simply restated what was charged in the indictment, which covered a three-month period and "alleged multiple events." The Defendant further argues that this error was compounded by the admission of his recorded jail phone calls, which were made outside the time provided in the indictment. The State responds that an election of offenses was not required because coercion of a witness is a continuing offense. In the alternative, the State responds that any error in the election was cured by the prosecutor's closing argument.

-16-

The indictment charged the Defendant with coercion of a witness occurring "between March 10, 2011 and June 9, 2011." After Det. Weary's testimony, the State made the following election of offenses:

> The State elects the coercion of a witness as the behavior between March the 10th, the date of the offense, and June the 9th of 2011, the day of the preliminary hearing. Those specific acts are those testified by [Ms. Tillery] between the time that the event took place and the time of the preliminary hearing, and those testified to here just now by [Det.] Weary.

The trial court charged the jury as follows regarding the State's election of offenses:

> The State alleges that the [D]efendant committed the crime of coercion of a witness between March 10, 2011, and June 9, 2011. Therefore, the evidence of telephone calls from the Hamilton County jail is not to be considered by you as evidence constituting coercion of a witness as alleged in the indictment.

During his closing argument, the prosecutor made the following statement about the coercion of a witness charge:

> What are the facts? What's the proof? Ms. Tillery's testimony, she received a phone call. She heard [the Defendant's] voice threaten her. And, of course, it was [the Defendant's] intent that she, one, not call the police, and that she not show up to court to testify. Why else would he call? And it's also supported by [Det.] Weary's testimony that you heard. [The Defendant] is guilty of coercion of a witness.

Our supreme court "has consistently held that the prosecution must elect the facts upon which it is relying to establish the charged offense if evidence is introduced at trial indicating that the defendant has committed multiple offenses against the victim." State v. Johnson, 53 S.W.3d 628, 630 (Tenn. 2001). "The election requirement safeguards the defendant's state constitutional right to a unanimous jury verdict by ensuring that jurors deliberate and render a verdict based on the same evidence." Id. at 631.

With respect to the State's argument that coercion of a witness is a continuing offense, we note that this court has previously held that it is not. Colbert, 2013 WL 3128698, at *24 n.6. However, we do not believe that the election in this case was insufficient. While the State's election simply referred back to the timeframe from the indictment and referred to the "specific acts" Ms. Tillery had testified occurred "between the time that the event took place and the time of the preliminary hearing," the election

also referred to Det. Weary's testimony regarding the phone call the Defendant made to Ms. Tillery immediately after the offenses.

Furthermore, any error made by the State in its election of offenses was cured during the prosecutor's closing argument. In his closing argument, the prosecutor made clear that the State was seeking a conviction for coercion of a witness based upon the Defendant's phone call to Ms. Tillery, which Det. Weary overheard, immediately after the offenses. "[F]ailure to instruct the jury properly about the State's election of offenses may be cured by a prosecutor's closing argument if it provides an effective substitute for the missing instruction." State v. Knowles, 470 S.W.3d 416, 427 (Tenn. 2015). Here, the State's closing argument provided an effective substitute for any inaccuracies in its original election.

Finally, regarding the Defendant's argument that the admission of his jail phone calls recorded after the timeframe alleged in the indictment also prevented a proper election from being made, we note that the trial court instructed the jury that those recordings were not to be considered as evidence of coercion of a witness. The jury is presumed to have followed the trial court's instructions. See State v. Keen, 31 S.W.3d 196, 232 (Tenn. 2002) (appendix); State v. Lawson, 695 S.W.2d 202, 204 (Tenn. Crim. App. 1985). Accordingly, we conclude that this issue is without merit.

*VI. Sentencing*

*A. Length of Sentence*

The Defendant contends that the trial court erred in setting the length of his sentences. The Defendant argues that the trial court failed to consider in mitigation the fact that the Defendant "had a mental health diagnosis from childhood," "that he had family support from his mother and sister," "that he had disavowed his gang affiliation," that he claimed to have contacted a police officer "to explain his version of the incident," "that no one was injured during the instant offense[s]," and that the entire incident "lasted only a couple of minutes." The State responds the trial court did not abuse its discretion in setting the length of the Defendant's sentences.

Appellate courts are to review "sentences imposed by the trial court within the appropriate statutory range . . . under an abuse of discretion standard with a presumption of reasonableness."[4] State v. Bise, 380 S.W3d 682, 709 (Tenn. 2012) (internal quotation marks omitted). A sentence will be upheld "so long as the statutory purposes and principles [of the Sentencing Reform Act] . . . have been properly addressed." Id. at 706.

---

[4] Here, we must note that at no point in his brief does the Defendant refer to Bise or the appropriate standard of review for this issue or his consecutive sentencing issue.

-18-

If this is true, this court may not disturb the sentence even if a different result were preferred. State v. Carter, 254 S.W.3d 335 (Tenn. 2008). Even if the trial court has misapplied an enhancement or mitigating factor, the sentence will be upheld if "there are other reasons consistent with the purposes and principles of sentencing, as provided by statute . . . ." Bise, 380 S.W.3d at 706. On appeal, the burden is on the defendant to show that the sentence is improper. Tenn. Code Ann. § 40-35-401(d).

The Sentencing Reform Act was enacted in order "to promote justice" by ensuring that every defendant "be punished by the imposition of a sentence justly deserved in relation to the seriousness of the offense." Tenn. Code Ann. § 40-35-102. In order to implement the purposes of the Sentencing Reform Act, trial courts must consider several sentencing principles. The sentence imposed for an offense "should be no greater than that deserved for the offense committed" and "should be the least severe measure necessary to achieve the purposes for which the sentence is imposed." Tenn. Code Ann. § 40-35-103(2), (4). Sentences involving incarceration "should be based on the following considerations":

> (A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
> (B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
> (C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant.

Tenn. Code Ann. § 40-35-103(2). Trial courts should consider the "potential or lack of potential for the rehabilitation or treatment of the defendant" when "determining the sentence alternative or length of term to be imposed." Tenn. Code Ann. § 40-35-103(5).

The record belies the Defendant's claim that the trial court did not consider his diagnosis for attention deficit hyperactivity disorder as a child and the fact that no one was harmed during the offenses. The trial court considered these facts along with the Defendant's "home life," the fact that he earned his G.E.D. while in federal prison, and his desire "to really become involved in [his daughter's] life" under the "catch-all" mitigating factor. See Tenn. Code Ann. § 40-35-113(13).

Furthermore, to the extent that the trial court did not consider the other facts listed by the Defendant in his appellate brief, a within range sentence imposed by the trial court will be upheld even if the trial court misapplied a mitigating factor so long as the trial court has not "wholly departed from" the Sentencing Reform Act and there are "other reasons consistent with the purposes and principles of sentencing" to support the sentence. Bise, 380 S.W.3d at 706. Here, there were multiple enhancement factors found

-19-

to justify the trial court's decision regarding the length of the Defendant's sentences. Accordingly, we conclude that the trial court did not abuse its discretion in setting the length of the Defendant's sentences.

## B. Consecutive Sentencing

The Defendant contends that the trial court erred in imposing partial consecutive sentences. The Defendant argues that the trial court erred by using the same prior convictions used to enhance the length of his sentences to justify partial consecutive sentencing. The Defendant further argues that partial consecutive sentencing was not warranted because all of the offenses were "related." The State responds that the trial court did not abuse its discretion in imposing partial consecutive sentences.

When reviewing a trial court's imposition of consecutive sentences, "the presumption of reasonableness applies," which gives "deference to the trial court's exercise of its discretionary authority to impose consecutive sentences if it has provided reasons on the record establishing at least one of the seven grounds listed in Tennessee Code Annotated section 40-35-115(b)." State v. Pollard, 432 S.W.3d 851, 861 (Tenn. 2013). "Any one of [the] grounds [listed in section 40-35-115(b)] is a sufficient basis for the imposition of consecutive sentences." Id. at 862 (citing State v. Dickson, 413 S.W.3d 735 (Tenn. 2013)).

Here, the trial court concluded that the Defendant was an offender whose record of criminal activity was extensive. See Tenn. Code Ann. § 40-35-115(b)(2). It is undisputed that the Defendant had a lengthy record of criminal activity. The Defendant admitted in the presentence report to having been adjudicated delinquent on several occasions in juvenile court, and the Defendant appeared in criminal court for the first time at fifteen years old. Since then, the Defendant has had three felony convictions and six misdemeanor convictions, in addition to a conviction in federal court. The Defendant has also had suspended sentences revoked on three prior occasions. Furthermore, current "offenses may be used in determining criminal history for the purposes of consecutive sentencing." State v. Richard Hanke, Sr., No. W2011-01830-CCA-R3-CD, 2012 WL 4470964, at *4 (Tenn. Crim. App. Sept. 27, 2012) (quotation marks omitted) (citing cases).

This court has previously held that, "[a]n extensive history of criminal conduct . . . can be used both to enhance a particular sentence and to require consecutive service of multiple sentences." State v. Marshall, 888 S.W.2d 786, 788 (Tenn. Crim. App. 1994). Likewise, our supreme court long ago rejected the argument that "the trial judge is required to take into consideration the fact that all of the offenses arose out of one single criminal episode or were inspired by the same general intent and minutely limited in both time and space" in deciding whether to impose consecutive sentences. As there was

ample evidence for the trial court to find that the Defendant had an extensive history of criminal activity, we conclude that the trial court did not abuse its discretion in imposing partial consecutive sentencing.

## CONCLUSION

Upon consideration of the foregoing and the record as a whole, the judgments of the trial court are affirmed.

_____
D. KELLY THOMAS, JR., JUDGE