FILED

04/19/2021

Clerk of the
Appellate Courts

IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 10, 2021

## STATE OF TENNESSEE v. TIMOTHY LEON LEDFORD

**Appeal from the Circuit Court for Bedford County**
**No. 19015    M. Wyatt Burk, Judge**

_____

### No. M2019-02045-CCA-R3-CD

_____

The Defendant, Timothy Leon Ledford, pleaded guilty to eleven counts of aggravated assault, and he was sentenced to an effective sentence of twenty-four years in confinement. On appeal, the Defendant challenges his sentence by arguing that the trial court abused its discretion by imposing an excessive sentence, denying him alternative sentencing, and ordering consecutive sentencing. We affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

JOHN EVERETT WILLIAMS, P.J., delivered the opinion of the court, in which ALAN E. GLENN and ROBERT W. WEDEMEYER, JJ., joined.

Jonathon Fagan, Nashville, Tennessee, for the appellant, Timothy Leon Ledford.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Robert J. Carter, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### FACTUAL AND PROCEDURAL HISTORY

According to the presentence report, the events underlying this case began just before midnight on November 2, 2018, when the Defendant, Mr. Timothy Leon Ledford, shot Mr. George Randall Henderson during a confrontation.[1] Mrs. Connie Ledford, the

---

[1] The transcript of the guilty plea hearing was not included in the record. Notwithstanding the failure to include the transcript, the record is sufficient for this court to address the issues raised

Defendant's wife, called 911 to report the incident, which occurred at the home she shared with the Defendant and Mr. Henderson. Mrs. Ledford asked the dispatcher for an ambulance to treat a gunshot wound and stated the Defendant fell and the AR-15 rifle he was wielding discharged. During the 911 call, a male voice was heard in the background stating, "I'll shoot you[;] don't think I won't." Mrs. Ledford advised the dispatcher that the Defendant was still wielding the rifle and that he had been drinking. Mrs. Ledford pleaded, "Timmy please stop!" According to the presentence report, a gunshot was audible in the recording, and she yelled, "He just shot the floor!" A male voice yelled, "Get the dog and get out of the house!" Mrs. Ledford advised the dispatcher that the Defendant was located in the living room and had forced everyone out of the house. She stated that the Defendant was "not going to let anybody come in the house" and that it would "probably come to a shootout." When asked by the dispatcher if the Defendant was trying to harm himself, Mrs. Ledford replied "No, he threatened to shoot me and the gun went off when he fell." Mrs. Ledford informed the dispatcher that three law enforcement officers had arrived, and the call ended.

Bedford County Sheriff's Department ("BCSD") Deputies Todd Sanders, Christopher Morton, and David Burns were dispatched to the Ledford residence. When they arrived on scene, they observed a male who had appeared to have been shot lying in the front yard. The deputies met Mrs. Ledford at the front of the residence, and Mrs. Ledford confirmed that the Defendant was still inside the residence and armed with an assault rifle. Deputies Morton and Burns attempted to render aid to the victim, while Deputy Sanders approached the front door of the residence. As Deputy Sanders approached the residence, he noticed that the door was ajar, and the Defendant appeared in the doorway wielding an assault rifle. Deputy Sanders observed the Defendant point the rifle at him, and the Defendant began shooting the rifle. Deputy Sanders returned fire with his pistol and took cover on the right side of the residence as the Defendant continued firing shots. When the gunfire ceased, Deputy Sanders ran toward the patrol cars. However, the Defendant began firing shots again when Deputy Sanders took cover in a ditch behind a tree. The Defendant continued firing shots sporadically for a period of time. During that time, Tennessee Highway Patrol ("THP") Trooper Barry Qualls and BCSD Deputy Tylar Prosser arrived on scene. Trooper Qualls drove a patrol car into the driveway to create a barrier so that Deputy Prosser could help Deputy Sanders out of the ditch. The Defendant continued firing shots, so Deputies Prosser and Sanders took cover behind the patrol car. Deputy Sanders crawled to Deputy Morton's vehicle to retrieve his duty rifle and positioned himself at the trunk of Deputy Prosser's vehicle to get a clear shot at the Defendant. Deputy Sanders advised the major in charge that he "had a shot on" the Defendant, but he instructed Deputy Sanders to hold fire. The Defendant left the doorway shortly after and went to an unknown location in the home.

---

on appeal. *See State v. Caudle*, 388 S.W.3d 273, 279 (Tenn. 2012). Under these circumstances, we "may review the merits of the sentencing decision with a presumption that the missing transcript would support the ruling of the trial court." *Id.*

Shelbyville Police Department ("SPD") Sergeant Tory Moore, Sergeant Jody Shelton, and Officer Clint Adams arrived on scene, and the victim was brought to safety. Once the victim was in a safe location, the Defendant began firing more shots. Sergeant Moore and Deputy Burns transported the victim to the hospital. A Bedford County S.W.A.T. team arrived to relieve the officers on scene.

Tennessee Bureau of Investigation ("TBI") Special Agents Zachary Buckhart, Leslie Purvis, Andrew Graves, and Robert Simmons investigated the incident and conducted several interviews. Mr. and Mrs. Kenneth and Marie Merrifield reported that they were neighbors of the Defendant and knew that he allowed Mr. Henderson to stay with him. Mr. and Mrs. Merrifield stated that they had heard their neighbors shoot guns before, but they thought it was target practice or to "handle a coyote problem." Mrs. Merrifield confirmed that she observed the shooting incident involving police at the Ledford residence.

Mr. Dale Farrington and his wife, Mrs. Jessica Farrington, were related to the Defendant and lived in a home directly behind the Ledford residence. As Agents Graves and Simmons approached the Farrington residence, they noticed that it appeared to have sustained damage during the November 2nd incident. Mr. Farrington informed the agents that the Defendant had shot at his residence previously, causing damage. Mrs. Farrington reported that she arrived home a little after 11:00 p.m. on November 2, 2018, when a friend informed her about a possible shooting at the Ledford residence. Mrs. Farrington went to where Mr. Henderson was lying on the lawn in the front of the home. She took cover when the Defendant began shooting, but she did not know if he was shooting at her. Mrs. Farrington informed the agents that she and her husband had previously filed multiple police reports involving the Defendant, and she recalled one instance when the Defendant "pulled a gun on her husband." She also recalled an incident when the Defendant said that he wanted to die and that if the police came back, he was going to "take some of them with him."

Mrs. Ledford confirmed that Mr. Henderson was the Defendant's best friend and had lived in their residence periodically for approximately ten years and consistently for the last five years. She returned home from work at around 9:30 p.m. on the night of the incident, and Mr. Henderson went to bed. She observed an empty half-pint bottle of whiskey and a second half-pint bottle with some whiskey still inside. She stated that the Defendant had been out of the pain clinic for two months and had recently been diagnosed with lung cancer and was in kidney failure. According to Mrs. Ledford, the Defendant used alcohol because he was no longer prescribed pain medication. She reported going to bed and being woken up around midnight by the Defendant's screaming. The Defendant entered her room and complained that Mr. Henderson had taken his pistol and hidden it from him. Mrs. Ledford offered to help him find the pistol, which was located on top of his mattress. She reported that the Defendant then wielded

his AR-15 rifle and shot into the floor, saying he was going to shoot Mr. Henderson if he saw him. The Defendant was intoxicated, and Mrs. Ledford tried to calm him down.

At that time, Mr. Henderson exited his bedroom and entered the kitchen where the Defendant and Mrs. Ledford were speaking. While the three of them were gathered in the kitchen, the Defendant pointed the rifle at Mr. Henderson and Mrs. Ledford. Mr. Henderson responded by pushing the Defendant, and, while the Defendant attempted to catch himself on the kitchen island, the rifle discharged. Mr. Henderson pushed the Defendant into the living room and then fell to the ground. Mrs. Ledford called 911, and the Defendant told everyone to leave or else he would shoot everyone. The victim crawled out of the home, and the Defendant fired a warning shot into the kitchen floor and yelled for Mrs. Ledford to leave. Mrs. Ledford left the residence through the back door where she met Mrs. Farrington. They both went to the front of the residence where they met law enforcement officers. Around front, the Defendant began firing shots, and Mrs. Ledford crawled to Mrs. Farrington's home. She reported that when the Defendant pointed the rifle at her, she thought he was going to shoot her.

The Defendant informed the agents that, on the day of the incident, he and Mr. Henderson were working on a toilet at his house. The Defendant and Mr. Henderson went to the store to purchase parts, and the Defendant purchased two bottles of whiskey on the way home. When they returned home, they took a break from working on the toilet, and the Defendant began drinking. The Defendant did not remember the shooting, but he recalled falling backwards and the gun discharging, as well as Mr. Henderson stating, "Oh, you shot me" and Mrs. Ledford yelling at him. The Defendant claimed that he was only intoxicated, not mad, and he stated that everything was an accident. However, he also stated that he saw officers arrive at the home and that he began shooting. The Defendant recalled that he was shot at one point and that he wanted to bleed out because he thought he had killed Mr. Henderson. The Defendant stated that he could have "opened up" on the law enforcement officers but that he did not want to hurt anyone. The Defendant said that he considered committing suicide with the rifle but that the rifle was out of ammunition. The Defendant stated that the rifle he used was an AR-15 and that he also used a pistol.

Mr. Henderson reported that on the day of the incident, he went to bed between 9:30 p.m. and 10:00 p.m., but he was awoken by the Defendant's voice. He went into the kitchen, where he saw the Defendant pointing a rifle at Mrs. Ledford's stomach. Mr. Henderson approached the Defendant and hit him on the shoulder to ask what was happening, and the Defendant turned around and pointed the rifle at him. Mr. Henderson grabbed the rifle and pushed the Defendant. The Defendant fell backwards into a cabinet. Mr. Henderson reported that the Defendant started grinning and began shooting the rifle at him by the time the Defendant hit the ground, striking him three times. Mr. Henderson believed the shooting was purposeful rather than accidental. He observed empty pints of liquor, beer cans, empty six-pack rings, and energy drinks at the residence. Mr.

4

Henderson crawled through the front door and slid down the porch to the front yard. He observed law enforcement and an ambulance, and he was eventually picked up by an officer and driven away in a truck. Mr. Henderson was hospitalized for more than a month following the incident and was treated for lacerations to his small intestines and colon as well as injury to his abdominal cavity and tissue.

The Defendant was charged with eleven counts of aggravated assault as reflected in the following table:

| Count | Charge / Basis | Victim |
|---|---|---|
| 1 | Aggravated Assault (resulting in serious bodily injury)  T.C.A. § 39-13-102(a)(1)(A)(i), -102(a)(1)(B)(i). | Mr. George Randall Henderson |
| 2 | Aggravated Assault (use or display of a deadly weapon)  T.C.A. § 39-13-102(a)(1)(A)(iii), -102(a)(1)(B)(iii). | Mrs. Connie Ledford |
| 3 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Mrs. Jessica Farrington |
| 4 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Deputy Todd Sanders |
| 5 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Deputy Tylar Prosser |
| 6 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Deputy David Burns |
| 7 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Deputy Christopher Morton |
| 8 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | William Spivy |
| 9 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Trooper Barry Qualls |
| 10 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Sergeant Tory Moore |
| 11 | Aggravated Assault (use or display of a deadly weapon) *Id.*; § 39-13-102(a)(1)(B)(iii). | Sergeant Jody Shelton |

On September 5, 2019, the Defendant pleaded guilty to eleven counts of aggravated assault in an open plea to the indictment. The trial court held a sentencing hearing.

The presentence report and personal statements of the Defendant and some of the victims were entered as exhibits at the hearing. The presentence report showed that the Defendant had been previously convicted of driving on suspended license, two counts of

casual exchange of marijuana, and "violation of legend drug law statutes," between 1984 and 1993. In terms of the Defendant's physical health, he reported having arthritis, nerve damage, five total hip replacements, glaucoma and blindness in his right eye, and had been diagnosed with stage one chronic kidney disease. Regarding the Defendant's mental health, he reported that he had depression and anxiety. The Defendant's Strong-R assessment resulted in a high score for violence. The Defendant reportedly had not used drugs since the 1980s, and he had not consumed alcohol since 2018. However, he reported taking prescribed medications of Diazepam and Oxycodone, which he described as treatment for nerve damage in his legs. He reported that he attended three drug treatment programs in the 1980s.

In the Defendant's personal statement, he alleged that on the day of the incident, he bought three pints of liquor. He stated that he worked on his truck for approximately four hours, sat in his recliner at around 8:00 p.m., and then went to bed in his room. He heard a noise at around 11:00 p.m. coming from the back of the house, so he got up and looked for his pistol but could not find it. He retrieved his rifle and inserted a magazine, but he did not load ammunition into the chamber. He stated that he observed Mrs. Ledford come from Mr. Henderson's room and asked her what she was doing back there. According to the Defendant, Mrs. Ledford could not give him a "straight answer," so he ordered them out of the house. The Defendant alleged that Mrs. Ledford followed him into the kitchen and that she called for Mr. Henderson. Mr. Henderson approached with what the Defendant thought was a pistol, and the Defendant tripped over a vent as he turned around. When the Defendant fell, the rifle he was holding discharged and shot Mr. Henderson. The Defendant ordered everyone out of the house again. He reported finding an unloaded pistol where the victim was shot.

In Mr. Henderson's statement, he stated that the Defendant knew what he was doing on the day of the incident, that the Defendant almost killed him and others, and that he wished the Defendant to spend the rest of his life in prison. Mrs. Ledford's personal statement was consistent with her statement given to law enforcement, but she added that she purchased liquor for the Defendant upon his request the day of the incident, that the Defendant shot at her multiple times while they were inside the house, and that in a prior incident, the Defendant, while intoxicated, produced a knife and then threw it at officers who responded to Mrs. Ledford's 911 call. In Mrs. Farrington's statement, she recounted the incident similarly to her statement given to law enforcement, stated that she and her family had lived in fear since it happened, and detailed the impact it had on her family's lives. She recalled that the Defendant once pointed a gun at Mr. Farrington and that the Defendant was "careless with loaded guns, waving them around and pointing them at people." Mrs. Farrington stated that the Defendant had lied and justified his behaviors in letters written to her family, friends, and neighbors. She wrote that the Defendant was a danger to society.

The Defendant presented an allocution at the sentencing hearing, explaining that at approximately 11:00 p.m. or 11:30 p.m., he accidentally shot Mr. Henderson when he hit a trailer vent with his foot, fell backwards, and the rifle he was wielding discharged. He stated that he fired additional shots above the door and in the trailer floor from the doorway, not to hurt anyone but to "maybe let the cops kill [him]." The Defendant explained that he had been drinking alcohol since approximately 4:00 p.m. and did not realize the extent of his intoxication. He informed the trial court that he no longer wanted to possess guns or drink alcohol and that he was taking medication. In regard to his past behavior, the Defendant stated that he once fired a gun at someone over a property dispute.

The trial court considered the evidence presented at the hearing, the presentence report, and the relevant sentencing factors. The trial court found that the Defendant was a Range I, standard offender. The trial court reviewed the Defendant's criminal history and applied as an enhancement factor that the Defendant had a "previous history of criminal convictions or criminal behavior," *see* T.C.A. § 40-35-114(1), and gave it "tremendous weight." The trial court also applied as an enhancement factor that "the offense involved more than one (1) victim." *See* T.C.A. § 40-35-114(3). In applying this factor, the trial court acknowledged that "if there are multiple counts and each victim is in a separate count that that's not to apply then," but it applied the factor because it found that there were victims not named in the charging instruments. The trial court gave this factor "much weight." The trial court applied in relation to count one, the aggravated assault of Mr. Henderson, an enhancement factor that "the defendant possessed or employed a firearm, explosive device or other deadly weapon during the commission of the offense" because the basis of the aggravated assault charge was serious bodily injury rather than the use of a deadly weapon. *See* T.C.A. § 40-35-114(9). The trial court gave this factor "tremendous weight." The trial court also applied as an enhancement factor to all counts that "the defendant had no hesitation about committing a crime when the risk to human life was high." *See* T.C.A. § 40-35-114(10). In relation to this factor, the trial court found that the "risk to human life [was] high," "distinct," and not inherent in the offense because "the actions caused risks to persons other than the victims" named in the charging instruments. The trial court gave the factor "tremendous weight." The trial court applied as an enhancement factor for counts four through eleven that the victim of the aggravated assault was a law enforcement officer, *see* T.C.A. § 40-35-114(19), and gave the factor "tremendous weight." The trial court found that the "Defendant knew or should have known that these specific victims were law enforcement" and that "he took steps to endanger their lives."

Regarding the trial court's application of mitigating factors, it applied as a factor that "[t]he defendant, because of youth or old age, lacked substantial judgment in committing the offense." *See* T.C.A. § 40-35-113(6). However, the trial court gave that factor "little to no weight in this scenario." The trial court considered the application of the factor that "[t]he defendant was suffering from a mental or physical condition that

7

significantly reduced the defendant's culpability for the offense," *see* T.C.A. § 40-35-113(8), but determined the factor was inapplicable because the court found the Defendant's intoxication to have been voluntary, *see id.* The trial court sentenced the Defendant to four years in counts one through three and six years in counts four through eleven.

Regarding consecutive sentencing, the trial court found that "the Defendant is an offender whose record of criminal activity is extensive" based upon his prior convictions and his eleven aggravated assault convictions. *See* T.C.A. § 40-35-115(b)(2). The trial court also found that "the Defendant is a dangerous offender whose criminal behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is high." *See* T.C.A. § 40-35-115(b)(4). The trial court stated that the Defendant had "an absolute lack of concern for foreseeable consequences in this case" and that it was a "miracle that no one was killed." The trial court found the Defendant committed the offenses by firing multiple rounds with an assault rifle, resulting in one of the victims lying out on the front yard for approximately two hours before aid could be rendered. The trial court found that "confinement for an extended period of time is necessary to protect society from the Defendant's unwillingness to lead a productive life and resort to criminal activity, and furtherance, of this lifestyle." In relation to this factor, the trial court found that the Defendant's behavior was a "culmination of years of that type of behavior, where [he would] just pull a gun on someone if [he was] mad at them." The trial court further found that the aggregate length of the consecutive sentence "reasonably relates to the offenses [of] which the Defendant stands convicted." The trial court found that consecutive sentencing was necessary in the Defendant's case.

In terms of an alternative sentence, the trial court considered the totality of the circumstances and found that the Defendant was at "a high risk for committing another crime" if placed on probation. The trial court found that the Defendant's risk/needs assessment reflected that "he was as high as one could be on aggression." The trial court found that "he would be a tremendous risk to him[self] or the public" and that, regardless, the Defendant was not statutorily eligible for probation because the sentence imposed was "greater than ten years." The trial court denied the Defendant alternative sentencing.

The trial court imposed an effective twenty-four-year sentence of confinement. For ease of reference, the following table illustrates the Defendant's sentences:

| Count(s) | Offense | Sentence | Concurrent With | Consecutive To |
|---|---|---|---|---|
| 1 | Aggravated Assault | 4 years | — | — |
| 2 | Aggravated Assault | 4 years | — | Count 1 |
| 3 | Aggravated Assault | 4 years | — | Counts 1 and 2 |
| 4 | Aggravated Assault | 6 years | — | Counts 1-3 |
| 5 | Aggravated Assault | 6 years | Count 4 | Counts 1-3 |
| 6 | Aggravated Assault | 6 years | Counts 4 and 5 | Counts 1-3 |
| 7 | Aggravated Assault | 6 years | Counts 4-6 | Counts 1-3 |
| 8 | Aggravated Assault | 6 years | — | Counts 1-7 |
| 9 | Aggravated Assault | 6 years | Count 8 | Counts 1-7 |
| 10 | Aggravated Assault | 6 years | Counts 8 and 9 | Counts 1-7 |
| 11 | Aggravated Assault | 6 years | Counts 8-10 | Counts 1-7 |

## ANALYSIS

The Defendant argues that the trial court abused its discretion by imposing an excessive sentence, denying him alternative sentencing, and ordering consecutive sentencing. The State responds that the trial court properly exercised its discretion in imposing the sentences. We agree with the State.

### A. Length of Sentences

This court reviews the length of a sentence for abuse of discretion, applying "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). A sentence will be upheld "so long as it is within the appropriate range and the record demonstrates that the sentence is otherwise in compliance with the purposes and principles listed by statute." *Id.* at 709-10. This standard of review also applies to "questions related to probation or any other alternative sentence." *Caudle*, 388 S.W.3d at 278-79.

The Defendant contends that his sentences were excessive, alleging that the trial court's imposition of maximum sentences within the sentencing range and its application of the enhancement and mitigating factors were erroneous. Once the trial court establishes the appropriate range of the sentence, the court must consider the following factors to determine the specific length of the sentence:

the evidence, if any, received at the trial and the sentencing hearing; the presence report; the principles of sentencing and arguments as to sentencing alternatives; the nature and characteristics of the criminal conduct involved; evidence and information offered by the parties on mitigating and enhancement factors; any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; any statement the defendant makes on his own behalf as to sentencing; the result of the validated risk and needs assessment conducted by the department and contained in the sentencing report; and the potential for rehabilitation.

T.C.A. §§ 40-35-103(5), -113, -114, -210(b)).  The weight given to mitigating and enhancement factors is a decision "left to the trial court's sound discretion." *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008).  Accordingly, "this court is not free to reevaluate the weight and value assigned to the factors found by the trial court." *State v. Edward Rudolph Wyse, Jr.*, No. E2019-01454-CCA-R3-CD, 2020 WL 6141011, at *13 (Tenn. Crim. App. Oct. 20, 2020), *no perm. app. filed*; *see Bise*, 380 S.W.3d at 699.  A trial court's misapplication of an enhancement or mitigating factor does not result in an abuse of discretion "if 'there are other reasons consistent with the purposes and principles of sentencing'" for imposing the sentence.  *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016) (quoting *Bise*, 380 S.W.3d at 706).

The trial court did not abuse its discretion in sentencing the Defendant.  The trial court found that the Defendant was a Range I, standard offender.  The Defendant was convicted of eleven counts of aggravated assault, Class C felonies.  *See* T.C.A. § 39-13-102(e)(1)(A)(ii).  The sentencing range for a Range I offender for a Class C felony is three to six years.  T.C.A. § 40-35-112(a)(3).  The trial court chose sentences in the appropriate range when it sentenced the Defendant to four years in counts one through three and to six years in counts four through eleven.

In terms of the enhancement factors, the trial court found that the Defendant had a "previous history of criminal convictions or criminal behavior," that "the offense involved more than one (1) victim," that "serious bodily injury occurred," that "the defendant had no hesitation about committing a crime when the risk to life was high," and that "the victim of the aggravated assault was a law enforcement officer."  T.C.A. §§ 40-35-114(1), (3), (9), (10) (19).  The trial court applied enhancement factor three to count one only and applied enhancement factor nineteen to counts four through eleven.  The Defendant argues that the trial court erred in finding factors three and ten applicable, challenging as erroneous the trial court's finding that there were multiple victims present at the scene other than those named in the charging instruments.  However, the presentence report shows that Deputy Adams was present while the Defendant fired shots and that unnamed S.W.A.T. officers responded to the ongoing incident.  The Defendant did not object to the entry of the presentence report or any portion as an exhibit at trial

and failed to include a transcript of the guilty plea hearing on appeal. We conclude that the record supports the trial court's application of enhancement factors three and ten, and we presume that the missing guilty plea hearing transcript would support the trial court's ruling, *see Caudle*, 388 S.W.3d at 279. Additionally, to the extent the Defendant argues that the trial court gave undue weight to the enhancement factors, he is not entitled to relief. *See Carter*, 254 S.W.3d at 345; *Edward Rudolph Wyse, Jr.*, 2020 WL 6141011, at *13. Therefore, we conclude that the Defendant failed to show the trial court misapplied the enhancement factors.

The Defendant also argues that the trial court failed to apply mitigating factors eight and eleven. Those factors are:

> (8) The defendant was suffering from a mental or physical condition that significantly reduced the defendant's culpability for the offense; however, the voluntary use of intoxicants does not fall within the purview of this factor;
>
> . . .
>
> (11) The defendant, although guilty of the crime, committed the offense under such unusual circumstances that it is unlikely that a sustained intent to violate the law motivated the criminal conduct;

T.C.A. §§ 40-35-113(8), (11). In the trial court's discussion of mitigating factor eight, it found that the Defendant was intoxicated voluntarily and that the factor did not apply. The record indicates the Defendant drank alcohol that day, and he admitted to doing so in his allocution to the court. Accordingly, the trial court did not abuse its discretion by failing to apply mitigating factor eight. Regarding factor eleven, the record offers conflicting accounts of whether the Defendant's shooting of Mr. Henderson was accidental, knowing, or intentional. By all accounts, however, the Defendant wielded an AR-15 during a confrontation with Mrs. Ledford and Mr. Henderson and then prevented law enforcement from rendering aid to Mr. Henderson by firing shots in their direction. He stated that he fired the rifle when law enforcement responded because he wanted them to kill him. The trial court considered this evidence and stated that the Defendant's behavior was a "culmination of years of that type of behavior, where [he would] just pull a gun on someone if [he was] mad at them." As a result, the trial court did not err in failing to apply mitigating factor eleven. To the extent the Defendant argues that the trial court failed to give enough weight to the mitigating factor it found applicable, he is not entitled to relief. *See Carter*, 254 S.W.3d at 345; *Edward Rudolph Wyse, Jr.*, 2020 WL 6141011, at *13.

## B. Alternative Sentencing

The Defendant challenges his sentence in part by arguing that the trial court abused its discretion by denying him an alternative sentencing. In the context of this

case, a defendant is eligible for probation if the actual sentence imposed upon the defendant is ten years or less. *See* T.C.A. § 40-35-303(a). The defendant bears the burden of establishing suitability for probation, T.C.A. § 40-35-303(b), including the burden of showing "that probation will 'subserve the ends of justice and the best interest of both the public and the defendant,'" *Carter*, 254 S.W.3d at 347 (quoting *State v. Housewright*, 982 S.W.2d 354, 356 (Tenn. Crim. App. 1997)). A court should consider in its decision to impose probation (1) the defendant's amenability to correction; (2) the circumstances of the offense; (3) the defendant's criminal record; (4) the defendant's social history; (5) the defendant's physical and mental health; and (6) special and general deterrence value. *State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017). "[A] trial court's decision to grant or deny probation will not be invalidated unless the trial court wholly departed from the relevant statutory considerations in reaching its determination." *State v. Sihapanya*, 516 S.W.3d 473, 476 (Tenn. 2014) (per curiam order).

In determining whether to order confinement, the trial court should consider the following

(A) Confinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
(B) Confinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
(C) Measures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C).

A defendant convicted of a Class C, D, or E felony as a standard offender "should be considered as a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." T.C.A. § 40-35-102(6)(A). The Defendant was convicted of eleven Class C felonies, but the trial court found that the evidence overcame the presumption of his favorability for an alternative sentence. It considered, under the totality of the circumstances, that the Defendant was "a high risk" for reoffending if placed on probation, that "he would be a tremendous risk to him[self] or the public," and that probation was "highly inappropriate for this particular case." The trial court also found that the Defendant was not statutorily eligible for probation even though he was sentenced to a term less than ten years in each of his counts. Although this decision was erroneous because a defendant's eligibility for an alternative sentence is determined on a count-by-count basis, *see State v. Adarius Dewayne Garth*, No. E2016-00931-CCA-R3-CD, 2017 WL 2493683, at *6 (Tenn. Crim. App. June 9, 2017); T.C.A. § 40-35-303, Sentencing Comm'n Cmts, the trial court had determined that it would not sentence the Defendant to probation prior to making this finding. Accordingly, the trial court relied upon an independent basis for denying the Defendant an alternative sentence and

12

ordering confinement. We conclude that the trial court's sentence reflects "a proper application of the purposes and principles" of the Sentencing Act. *See Bise*, 380 S.W.3d at 707. Therefore, the Defendant is not entitled to relief on this ground.

## C. Consecutive Sentencing

The Defendant also contends that the trial court abused its discretion by denying him concurrent sentencing. A trial court "may order sentences to run consecutively if it finds by a preponderance of the evidence that one or more of the statutory criteria exists." *State v. Black*, 924 S.W.2d 912, 917 (Tenn. Crim. App. 1995). Among the statutory criteria are that "[t]he defendant is an offender whose record of criminal activity is extensive" and that "[t]he defendant is a dangerous offender whose behavior indicates little or no regard for human life and no hesitation about committing a crime in which the risk to human life is high." T.C.A. § 40-35-115(b)(2), (b)(4). In imposing consecutive sentences based on a dangerous offender status, it is necessary that "the terms reasonably relate to the severity of the offenses committed and are necessary in order to protect the public from further serious criminal conduct by the defendant." *State v. Wilkerson*, 905 S.W.2d 933, 938 (Tenn. 1995).

In the present case, the trial court found that the Defendant's criminal record was extensive and that he was "a dangerous offender whose criminal behavior indicates little or no regard to human life and no hesitation about committing a crime in which the risk to human life is high." *See* T.C.A. § 40-35-115(b)(2), (b)(4). Additionally, the trial court found that the aggregate length of the sentence "reasonably relates to the offenses the Defendant stands convicted" and that "confinement for an extended period of time is necessary to protect society from the Defendant's unwillingness to lead a productive life and resort to criminal activity." *See Wilkerson*, 905 S.W.2d at 93. The Defendant argues that the trial court erred by finding both factors applicable; however, we conclude that the trial court appropriately found either applicable by a preponderance of the evidence. The evidence showed that the Defendant shot Mr. Henderson after wielding an assault rifle during a confrontation with him, and then fired shots when law enforcement responded. The Defendant's conduct was dangerous, presented a high risk to human life, and, as the trial court found, left the victim lying on the lawn for approximately two hours before aid could be rendered. The Defendant's criminal record reflects only driving and drug offenses dating back to a period between 1984 and 1993. However, the record also shows that the Defendant had previously engaged in dangerous criminal behavior, including pulling a gun on Mr. Farrington and shooting at the Farrington's residence. Accordingly, the trial court did not abuse its discretion by imposing partial consecutive sentencing in the Defendant's case. The Defendant is not entitled to relief on this issue.

**CONCLUSION**

Based upon the foregoing reasons, we affirm the judgments of the trial court.

_____
JOHN EVERETT WILLIAMS, PRESIDING JUDGE