IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 24, 2021

## STATE OF TENNESSEE v. JACKSON CHAPMAN NORTH

**Appeal from the Circuit Court for Bedford County
Nos. 19-CR-19026, 19-CR-19053      M. Wyatt Burk, Judge**

———————————

### No. M2020-00221-CCA-R3-CD

———————————

The Defendant, Jackson Chapman North, pleaded guilty in the Bedford County Circuit Court to two counts of vandalism valued at $2,500 or more but less than $10,000, a Class D felony, vandalism valued at more than $1,000 but less than $2,500, a Class E felony, vandalism valued at $1,000 or less, a Class A misdemeanor, and unlawful possession of a weapon, a Class C misdemeanor. *See* T.C.A. §§ 39-14-408 (2018) (vandalism); 39-14-105 (2018) (grading); 39-17-1307 (2018) (unlawful weapon possession). The trial court ordered partial consecutive service and imposed an effective six-year sentence, with four years, sixty days in confinement and the remainder on probation. On appeal, the Defendant contends that his sentence is excessive. We affirm the Defendant's sentence, but as a matter of plain error, we reverse the trial court's restitution order and remand the case for proper restitution determinations.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which D. KELLY THOMAS, JR., J., joined. NORMA MCGEE OGLE, J., concurring in results.

Christopher P. Westmoreland, Shelbyville, Tennessee, for the appellant, Jackson Chapman North.

Herbert H. Slatery III, Attorney General and Reporter; Ruth Anne Thompson, Senior Assistant Attorney General; Robert James Carter, District Attorney General; Michael D. Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The Defendant's convictions relate to incidents occurring in June 2018 that resulted in two indictments. In case number 19026, the Defendant was charged with three counts of vandalism and misdemeanor possession of a firearm with the intent to go armed. In case

number 19053, the Defendant was charged with an additional count of vandalism. The Defendant pleaded guilty as charged in the indictments. Pursuant to the plea agreement, the trial court would determine the length and the manner of service of the sentences. The guilty plea hearing transcript is not included in the appellate record. However, the presentence report, which was received as an exhibit, provided a sufficient recitation of the factual basis for the guilty pleas. *See State v. Caudle*, 338 S.W.3d 273, 279 (Tenn. 2012).

The presentence report reflects the following summary of the events leading to the indictments:

On June 22, 2018, Officer John Cooke of the Shelbyville Police Department was dispatched . . . regarding a vandalism. Ronald Craig of Charter Communications reported . . . that during the previous night someone had shot the company's fiber optic cable running to the Verizon cell tower located on Sims Road. It appeared to have been done with a shotgun. Mr. Craig estimated the damage to be approximately $20,000.

On June 27, 2018, Detective Cody Swift discovered Ethan Barrett had been arrested by the Bedford County Sheriff's Department for shooting livestock with a high-powered rifle. During his interview, Mr. Barrett provided the weapons he and his co-defendants had used, one of which was a Smith and Wesson shotgun. A forensic analysis of Ethan Barrett's cell phone was conducted by Detective Charles Merlo.

On June 28, 2018, Detective Swift conducted an interview with Ethan Barrett in reference to the damaged fiber optic cable. Mr. Barrett admitted to being on Sims Road during the time . . . of the incident and reported being with Jackson North and a juvenile . . . .

Later that day, Jackson North was arrested by the Bedford County Sheriff's Department for his involvement with the livestock shootings. Detective Swift interviewed Mr. North who stated [the juvenile] shot a 22 handgun out the window of a vehicle. When asked about the damage to the cable, Mr. North stated it was probably one of them since they had been shooting a lot during that time period.

On June 29, 2018, [the juvenile] was questioned by the Bedford County Sheriff's Department and admitted to being on Sims Road. He stated all three defendants had taken shots at the wire with the shotgun and that Mr. North's shot struck the wire.

On June 26, 2018, after the onset of the wire investigation, Detective John Sweeney responded with deputies to . . . Simmons Road in reference to livestock being shot from the roadway. Upon arrival, Detective Sweeney was met by James Simmons, owner of the livestock, who stated his 4 month old black angus calf had been shot and killed. Mr. Simmons stated his cousin, Alben Simmons, witnessed the shooting. Detective Sweeney spoke with Alben Simmons who stated he heard 7 loud shots while he was working on his fence, located a short distance from where the shots were fired. He stated he heard 2 shots, a pause, and then 5 rapid shots. He stated, "The shots were loud like a shot gun or something." He stated he saw a car, a grey sedan, possibly a Ford Taurus but smaller, spinning tires headed his direction. He observed the passenger and described him as white male, . . . in his late 20's or early 30's, no facial hair and . . . tall. The vehicle passed him at a high rate of speed . . . .

Detective Sweeney was able to locate[] 7 spent silver shell casings, . . . commonly used in an AK-47 or SKS. The calf had one gun shot wound to the nasal area and did die as a result of the gun shot wound.
Later that evening, Deputy Tylar Prosser responded to . . . Coble Road and upon arrival was met by Rhonda Smith who stated her walking horse had been shot and was found dead in her field. The horse was located approximately 50 yards from the roadway. Ms. Smith stated there was no value that could be put on a 19 year old gray roan walking horse, as it was more of a family member than a pet. Ms. Smith reported the horse having a value of $10,000.

On June 27, [2018], Detective Ramon Castillo responded to . . . Comstock Road and was met by Randal Boyce who reported his registered [Limousin] cow dead in his field, approximately 50 yards from the road. A neighbor, James Pinkston, reported he heard 4 loud shots the previous afternoon around 1PM. He stated as he walked outside he observed a sedan type vehicle stopped by the field where the cow was laying down. The car then sped off . . . . During his investigation, Detective Castillo was able to find a silver spent shell casing . . . , which appeared to match the 7 casings recovered at Simmons Road the day before. Mr. Boyce reported the [Limousin] cow to be of $2,000 in value.

On the same day, investigators received a snapchat video of Ethan Barrett shooting [what] appeared to be an AK47 from a vehicle in a rural area. Detective Sweeney and Detective Lieutenant Scott Jones went to . . . speak with Ethan Barrett. Upon arrival, Mr. Barrett did consent to . . . entering his residence, at which time two rifle cases were noticed.

Lieutenant Jones asked Mr. Barrett if there were any weapons in the home to which he responded in the negative. Mr. Barrett was advised of his Miranda rights . . . . When asked if anyone else was in the home, Mr. Barrett stated his girlfriend was present. Lieutenant Jones then asked if Mr. Barrett had shot any guns recently and Mr. Barrett responded with, "No I don't own any guns!" He was then asked what he did the day before to which he stated they got food and hung out here (home). Mr. Barrett then asked what this was all about Lieutenant Jones advised they were investigating livestock shootings within Bedford County. That is when Mr. Barrett stated he shouldn't answer anymore questions. Lieutenant Jones then stated they needed to speak with his girlfriend, Cassidy Carpenter. Mr. Barrett began to walk to the bedroom to wake Ms. Carpenter when Detective Sweeney noticed a rifle and handgun in plain view on top of the cabinets in the kitchen. The guns appeared to match the ones in the snapchat videos . . . of Mr. Barrett. Detective Sweeney recovered the guns along with a black 12 gauge and secured them all for evidence. . . . Mr. Barrett was then detained for his involvement in the shootings.

Lieutenant Jones interviewed Ms. Carpenter outside of the apartment and she stated she was unsure of Mr. Barrett's whereabouts the day before but confirmed they were together that night.

. . . .

During an interview with Lieutenant Jones, Mr. Barrett confessed to shooting two cows and stated that Jackson North shot the horse. He stated the shootings took place during the daytime and at that time he and Mr. North were present. Later that evening, the two picked up [the juvenile] and went back out to shoot more. He stated during that time they were in the area of Sims Road, Pickle Road, and Highway 64. Mr. Barrett admitted the guns located in his apartment were the same ones used during these shootings. Mr. Barrett gave consent to have his apartment searched and a download of his cell phone.

Detective Merlo's analysis of Mr. Barrett's phone allowed for the extraction of video footage which showed Mr. Barrett and Mr. North shooting at livestock. . . .

Lieutenant Jones made contact with Jackson North . . . . He stated he would speak with investigators about his involvement in the case. At that time, he confirmed that he and Mr. Barrett were the ones who shot the animals. He was asked what vehicle was used during this matter and he replied it was his

2004 Ford Taurus and that it was hidden down the road behind the "substation."

Sergeant Josh Tolar transported Mr. North to the "substation" where the car was located. Mr. North consented to a search . . . which revealed multiple shell casings inside. Mr. North stated there were four additional shell casings that he threw on top of the substation building. Those casings were located and collected for evidence. The[y] . . . matched the ones recovered at the crime scenes.

Mr. North stated he was present when all three animals were shot and that Ethan Barrett shot the two cows and that he, Mr. North, shot the horse. His story of that evening and activity with Mr. Barrett and [the juvenile] agreed with the statements provided by Mr. Barrett.

On the same day, [the juvenile], . . . admitted to shooting a .22 revolver from the vehicle on Pickle Road. He also stated that the trio were out shooting the AK47, shotgun, and .22 revolver. He reported at one point they were shooting the shotgun in the air and he observed a wire fall afterwards. [The juvenile] stated he was not present when Mr. North and Mr. Barrett shot the animals.

James Simmons submitted a victim impact statement, which was attached to the presentence report and which reflected a total loss of $2,950. Rhonda Smith submitted a victim impact statement, which was received as an exhibit. Ms. Smith claimed a loss of $7,500, which included the cost of her horse and medical expenses for her mental anguish. Likewise, an invoice from Charter Communications was received as an exhibit and reflected that the cost to repair the fiber optic cable was $2,275. A report from John K. Teague, County Extension Director for The University of Tennessee Extension Institute of Agriculture, estimated the value of Randall Boyce's registered Limousin cow at $2,750.

The presentence report reflects that the Defendant, who was age twenty at the time of the presentence investigation, had a previous conviction for misdemeanor criminal trespass. The Defendant lived with his fiancée and son. The Defendant reported leaving high school in the twelfth grade to enter a rehabilitation program and obtaining his GED on August 27, 2019. The Defendant reported that he intended to enlist in the United States Army after the resolution of this case. The Defendant reported excellent physical health and good mental health but noted he had been diagnosed with attention deficit hyperactivity disorder and had been prescribed medication previously. The Defendant reported first drinking alcohol at ages twelve and thirteen and drinking beer twice per week. He reported first smoking marijuana at age twelve and frequent use thereafter. He likewise reported using cocaine and methamphetamine as a teenager and using "acid" every two weeks for

about six months before his incarceration in this case. In 2017, the Defendant was treated for substance abuse involving cocaine, marijuana, and alcohol. On January 19, 2019, the Defendant entered a rehabilitation program upon his release from pretrial confinement until mid-June 2019. The Defendant reported attending "night owls," Alcoholics Anonymous, and Narcotics Anonymous two to three times per week since leaving the program. The Defendant reported that this case would not have happened if he had been sober.

The Defendant reported current employment with a home foundation repair company, along with previous employment as a cashier and for "store opening solutions." A Strong-R assessment reflected that the Defendant had a moderate score for recidivism.

The Defendant submitted a written statement to the trial court. In the statement, the Defendant said he did not intend to shoot any animals on the day of the incidents, that his codefendant asked if he wanted to shoot the guns, and that he was hesitant to shoot at the animals. He said that after he shot the horse, he drove away feeling "[queasy] and remorseful." He stated he had been sober for more than one year, that he had worked hard to purchase a car and to obtain an apartment, and that he and his fiancée were expecting a child. He said that he had been promoted to foreman/crew lead.

The Defendant testified that immediately after his release from pretrial confinement, he voluntarily entered a halfway house. He said that after three months at the halfway house, he was "clean and sober" and that he leased an apartment. He said that he had been employed since January. The Defendant said that he earned $13.50 per hour at work and that he generally worked forty hours per week.

The Defendant testified that he entered a rehabilitation program because he knew he "needed to get to the problem and fix it." He said he needed to fix himself before he could focus on other aspects of his life. He said that since his release from pretrial confinement, he had not been arrested and had continued attending Alcoholics Anonymous meetings, the frequency of which depended on his work schedule. He said, though, that some weeks he could attend one meeting and that other weeks he could attend three to four meetings. He said that his son was born a couple of weeks before the sentencing hearing and that his son and his fiancée lived with him.

The Defendant testified that he had previous issues with drugs and alcohol and that these issues contributed to the events in this case. He said that if the trial court granted his request for an alternative sentence, he intended to further his education, to continue working, and to raise his son.

On cross-examination, the Defendant testified that although he had hoped to enlist in the United States Army after the resolution of this case, his enlistment was "on hold." He said that although he scored well on the ASVAB, the officials needed "more stuff about

[his] case." He said that he could not be on probation at the time of enlistment. He said he last spoke to the Army recruiter three months before the sentencing hearing.

The Defendant testified that although he was charged with aggravated burglary in 2017, he was convicted of misdemeanor trespass on March 20, 2018, at which time he was released after service of fifty-six days in jail. He agreed that the offenses in the present case occurred on June 24 and 26, 2018, approximately three months after the resolution of the trespass case. He agreed that the fifty-six days in jail for trespass did not do him "a world of good," but he said the approximate seven months' pretrial confinement in the present case has been beneficial.

The Defendant testified that he attended two Alcoholics Anonymous meetings the week before the sentencing hearing and that he had not attended any meetings the week of the sentencing hearing because of his work hours and the birth of his son. The Defendant said that his gross weekly income averaged $600, depending on the number of hours worked. He estimated he might be able to pay $200 per week toward restitution but that a realistic figure was $100 per week. He said he would have a negative drug screen if required to undergo a screen.

The Defendant testified that although the victims did not attend the sentencing hearing, he wanted the victims to know he was "extremely sorry," and he apologized. He said that he was ashamed he allowed himself to "get to a place" in which he could do "something like this." He said, "[I]t takes something like this to grow somebody up sometimes, and once it happens, it happens, and you recognize it."

Relative to mitigation evidence, the trial court applied factor (1) because the Defendant's conduct "neither caused nor threatened serious bodily injury." *See* T.C.A. § 40-35-113(1) (2019). The court placed "very little weight, if any at all" on this factor based on the totality of the circumstances, noting that the presentence report reflected that Mr. Simmons was outdoors when one of the shootings occurred. The court determined, though, that the evidence did not show that Mr. Simmons or anyone else was in the "zone of danger" during the shootings. The court applied factors (9) and (10) because the Defendant assisted law enforcement during the investigation in the apprehension of others involved in the offenses and assisted law enforcement with his car's location, leading to the recovery of cartridge casings linked to the shootings. *See id.* §§ 40-35-113(9) ("The defendant assisted the authorities in uncovering offenses committed by other persons or in detecting or apprehending other persons who had committed the offenses[.]"), 40-35-113(10) ("The defendant assisted the authorities in locating or recovering any property or person involved in the crime[.]"). The court placed little weight on these factors.

The trial court applied enhancement factors (1), (2), and (9). *See id.* § 40-35-114 (2019). The court found that the Defendant had a previous conviction for misdemeanor

trespass. *See id.* § 40-35-114(1) ("The defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range[.]"). The court, however, placed "very little weight" on this factor and noted that the Defendant's criminal history was "far better than some[.]" Furthermore, the court found that the Defendant was a leader in the commission of an offense involving two or more criminal actors based upon the Defendant's presence, his participation in the shootings, his utilizing his car, and "presumably" his driving "to each location to commit these heinous acts of vandalism." *See id.* § 40-35-114(2). The court stated that although codefendant Barrett was likely another leader in the offenses, the Defendant was likewise a leader in the offenses. The court placed "tremendous weight" on this factor. The trial court applied enhancement factor (9) to each of the vandalism convictions based upon the Defendant's use of a firearm. *See id.* § 40-35-114(9) ("The defendant possessed or employed a firearm . . . during the commission of the offense[.]"). The court placed "tremendous, tremendous weight" on this factor.

The trial court determined that the Defendant was a Range I, standard offender based upon his previous criminal history. In case number 19026, the court imposed eleven months, twenty-nine days at 75% for the vandalism of Mr. Simmons's calf, valued at less than $1,000. The court imposed four years for the vandalism of Ms. Smith's horse, valued at $2,500 or more but less than $10,000. The court imposed two years for the vandalism of Mr. Boyce's cow, valued at more than $1,000 but less than $2,500. The court imposed thirty days at 75% for the misdemeanor firearm violation. In case number 19053, the court imposed two years for the vandalism of the fiber optic cable, valued at $2,500 or more but less than $10,000. The court determined that the enhancement factors outweighed the mitigating factors and that, as a result, the maximum sentence within the appropriate range was appropriate.

In case number 19026, the trial court ordered concurrent service of the three livestock vandalisms and the firearm sentence. However, the court determined that the Defendant was "an offender whose record of criminal activity [was] extensive[.]" *See id.* § 40-35-115(b)(2) (2019). The court based its determination on the Defendant's previous misdemeanor trespass conviction and the "series of events" in the present case. The court found that, based upon the totality of the present offenses, "this [was] not just simply one act of vandalism" but rather "a string of four separate [incidents] at four separate locations." The court found that three vandalisms involved living, breathing, and vulnerable animals and that, based upon victim impact evidence, Ms. Smith's horse had been a "19-year member of a family." As a result, the court imposed consecutive service of the two-year sentence for the vandalism of the fiber optic cable in case number 19053 with the four-year sentence in case number 19026, for an effective six-year sentence. The trial court determined, as well, that the consecutive sentences were necessary to protect the public from the Defendant's possible future criminal conduct. The court found that the aggregate sentence was reasonably related to the severity of the offenses.

-8-

In denying the Defendant's requests for full probation and judicial diversion, the trial court considered the presentence report, the Defendant's mental and physical health, the circumstances of the offenses, the Defendant's criminal history, the Defendant's social history, the Defendant's employment history, deterrence, and the best interests of the Defendant and the public. The court found that the Defendant had used alcohol and illegal drugs from an early age and had progressed to marijuana and methamphetamine. The court considered the circumstances of the offenses to be violent and reprehensible, which it weighed heavily against the Defendant. The court found that the Defendant's only previous conviction was misdemeanor trespass, which the court weighed in favor of the Defendant. The court found that although the Defendant was employed and had obtained his GED while this case was pending, the Defendant had not pursued employment and education until his arrest in this case. The court, likewise, expressed concern that although the Defendant had sought substance abuse treatment in high school, the treatment "did nothing to curb the addiction, which has persisted."

Relative to recidivism, the trial court determined the Defendant had "a risk for re-offending" because mere months after his criminal trespass conviction and service of more than fifty days' confinement, the Defendant committed multiple new offenses. The court was "neutral" on whether the Defendant would comply with the terms of probation because the Defendant had never served a sentence on probation. The court determined that the need to protect society from the Defendant's possible future conduct was great. The court expressed concern that the Defendant's conduct, without court intervention, would "have morphed into a much more heinous act." The court nonetheless found that the factor weighed slightly in favor of the Defendant.

The trial court, however, found that full probation and judicial diversion would depreciate the seriousness of the offenses, determining that the seriousness of the offenses outweighed all factors in favor of alternative sentencing. The court found that the circumstances of the offenses were especially violent, horrifying, shocking, reprehensible, offensive, or otherwise of excessive or exaggerated degree and that the nature of the offenses outweighed all factors in favoring full probation. The court found that the offenses involving the livestock were "extremely cruel" because the Defendant participated in killing three vulnerable animals. The court found that the Defendant's conduct prevented the victims from deriving income from the animals and from enjoying a "family member." In case number 19026, the court ordered the Defendant to serve the four-year sentence in confinement. In case number 19053, the court ordered the Defendant to serve sixty days of the two-year sentence. Therefore, the Defendant was ordered to serve four years and sixty days' confinement and to serve the remainder of the effective six-year sentence on probation.

The trial court ordered the Defendant to pay restitution. The court ordered, without explanation, restitution in the amounts of $2,950 to James Simmons, $7,500 for Rhonda

Smith, and $2,750 for Randall Boyce.  The court stated that the monthly payment amount "will be set by the parole officer at the appropriate time, per month or whatever it's indicated."  Likewise, the court ordered, without explanation, the Defendant to pay $2,275 restitution for the destruction of the fiber optic cable.  The court stated that the monthly rate could be determined by the court at a later date but gave the probation officer assigned to the Defendant's case the ability to determine the rate.  This appeal followed.

On appeal, the Defendant contends that his sentence is excessive.  He argues that the court failed to consider the evidence supporting full probation.  The State responds that the court did not abuse its discretion during sentencing.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103, -210; *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. §§ 40-35-102 (2018), 41-1-126 (2018) (validated risk and needs assessments).

Likewise, a trial court's application of enhancement and mitigating factors are reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07.  "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id*. at 706.  "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id*.

The standard of review for questions related to probation or any other alternative sentence is an abuse of discretion with a presumption of reasonableness. *Caudle*, 388 S.W.3d at 278-79.  Generally, probation is available to a defendant sentenced to ten years or less. T.C.A. § 40-35-303(a) (2014).  The burden of establishing suitability for probation rests with a defendant, who must demonstrate that probation will "'subserve the ends of justice and the best interest of both the public and the defendant.'" *State v. Souder*, 105 S.W.3d 602, 607 (Tenn. Crim. App. 2002) (quoting *State v. Dykes*, 803 S.W.2d 250, 259

-10-

(Tenn. Crim. App. 1990)); *see* T.C.A. § 40-35-303(b); *State v. Carter*, 254 S.W.3d 335, 347 (Tenn. 2008).

A sentence is based upon "the nature of the offense and the totality of the circumstances," including a defendant's background. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991); *see State v. Trotter*, 201 S.W.3d 651, 653 (Tenn. 2006). A trial court is permitted to sentence a defendant to incarceration when:

> (A) [c]onfinement is necessary to protect society by restraining a defendant who has a long history of criminal conduct;
>
> (B) [c]onfinement is necessary to avoid depreciating the seriousness of the offense or confinement is particularly suited to provide an effective deterrence to others likely to commit similar offenses; or
>
> (C) [m]easures less restrictive than confinement have frequently or recently been applied unsuccessfully to the defendant[.]

T.C.A. § 40-35-103(1)(A)-(C) (2014); *see Trotter*, 201 S.W.3d at 654. A trial court must consider (1) the defendant's amenability to correction, (2) the circumstances of the offense, (3) the defendant's criminal record, (4) the defendant's social history, (5) the defendant's physical and mental health, and (6) the deterrence value to the defendant and others. *See State v. Trent*, 533 S.W.3d 282, 291 (Tenn. 2017) (concluding that the same factors used to determine whether to impose judicial diversion are applicable in determining whether to impose probation); *see also State v. Electroplating*, 990 S.W.2d 211, 229 (Tenn. Crim. App. 1998); *State v. Parker*, 932 S.W.2d 945, 958 (Tenn. Crim. App. 1996).

The abuse of discretion with a presumption of reasonableness standard also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id*. A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2019). In determining whether to impose consecutive sentences, though, a trial court must ensure the sentence is "no greater than that deserved for the offense committed" and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-103(2), (4) (2019); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

The trial court imposed within-range sentences for each conviction offense. *See* T.C.A. §§ 39-14-105 (grading); 40-35-111 (imprisonment terms for felonies and misdemeanors). As a result, the court's determinations are afforded a presumption of reasonableness. The record reflects that the court considered the evidence at the sentencing

hearing, the presentence report, the principles of sentencing, arguments of counsel, the nature and circumstances of the offense, the mitigating and enhancement factors, the Defendant's statements, and the Defendant's potential for rehabilitation. Although the court applied three mitigating factors, the court placed little weight on the mitigation evidence and applied three enhancement factors. The court likewise determined that the enhancement factors outweighed the mitigation evidence. The court placed significant weight on the Defendant's use of a firearm to commit the vandalism offenses, three of which involved the killing of two cows and one horse, and the Defendant's being a leader in an offense involving two or more people.

The record reflects that the trial court denied the Defendant's request for full probation based upon the seriousness and circumstances of the offenses. T.C.A. § 40-35-103(1)(B). The court found that the circumstances of the offenses outweighed all factors favoring full probation. The court considered the Defendant's killing vulnerable animals especially violent and extremely cruel, which is supported by the evidence. The Defendant committed "a string" of three separate animal killings at three distinct locations, along with the destruction of the fiber optic cable at a fourth location. The record supports the trial court's determinations and the denial of probation.

Likewise, the record supports the trial court's imposition of partial consecutive service based upon the Defendant's being an offender whose record of criminal activity was extensive. *See* T.C.A. § 40-35-115(b)(2). Although the Defendant had only one previous conviction for misdemeanor trespass, the Defendant committed a series of criminal acts in the present case. The offenses occurred on two distinct dates and at different locations and involved killing three animals and destruction of a fiber optic cable, all with the use of a firearm. The record supports the court's determination that "this [was] not just simply one act of vandalism" but rather "a string of four separate [incidents] at four separate locations." This court has concluded that "[c]urrent 'offenses may be used in determining criminal history for the purposes of consecutive sentencing.'" *State v. Branham*, 501 S.W.3d 577, 596 (Tenn. Crim. App. 2016) (quoting *State v. Richard Hanke, Sr.*, No. W2011-CCA-R3-CD, 2012 WL 4470964, at *4 (Tenn. Crim. App. Sept. 27, 2012)).

We conclude that the trial court did not abuse its discretion by imposing an effective six-year sentence, with four years and sixty days to serve in confinement and the remainder on probation. Although the Defendant argues that the court did not consider his employment, continued attendance at Alcoholics Anonymous, and family support, the record reflects otherwise. The court considered the mitigation evidence, which included the Defendant's employment, his social history, his education, and his family support, and the court determined that the nature and circumstances of the offenses outweighed these factors. The Defendant is not entitled to relief on this basis.

However, the record reflects plain error in the trial court's imposition of restitution. *See State v. Smith*, 24 S.W.3d 274, 282 (Tenn. 2000); *State v. Adkisson*, 899 S.W.2d 626, 641-42 (Tenn. Crim. App. 1994). The record reflects that, before the trial court rendered its sentencing determinations, defense counsel and the trial court briefly discussed the Defendant's testimony that he might be able to pay $100 per week in restitution, although his gross weekly income averaged $600. Counsel told the court that the Defendant was being "optimistic" that he could afford $100 per week. The court stated that the Defendant's assessment of his ability to pay restitution was "aggressive." Counsel told the court that counsel doubted the Defendant could afford $100 per week and that $75 per week "would be stretching [the Defendant] to his limits" based upon the Defendant's reported gross income.

The trial court ordered the Defendant to pay restitution totaling $15,475, which was the precise aggregate pecuniary loss reported by the victims. The court did not specify the amount and time of payment but rather, directed the parole and probation officer who would later supervise the Defendant to establish a monthly payment amount upon the Defendant's release from confinement. Although the court did not provide specific findings regarding restitution, the record reflects that the court's sole focus was the victims' pecuniary losses. The record fails to reflect that the court considered the Defendant's future ability to pay restitution. We note that the Defendant was ordered to serve four years and sixty days of a six-year sentence in confinement. The court did not determine whether the Defendant would have the ability to pay any restitution upon his release to probation after more than four years in confinement. In connection with the Defendant's ability to pay restitution, the Defendant's sworn affidavit of indigency reflects that he had one son and that his assets were limited to his income from Ground Up Foundation, which was $600-$700 every two weeks at the time the affidavit was signed, and $500 in his checking account. The affidavit likewise reflects that the Defendant did not own vehicles, real estate, or other assets. At the sentencing hearing, the Defendant testified that he had leased an apartment, paid rent, and bought a car.

A defendant convicted of a felony or misdemeanor may be ordered to pay restitution to the victim or victims in conjunction with a sentence of probation or continuous confinement in a local jail, workhouse, or department of correction. T.C.A. § 40-35-104(a), (c)(2), (6), (8) (2014) (subsequently amended); *see id.* § 40-35-304(a) (2019). Restitution is mandatory in theft cases. *Id.* § 40-20-116(a) (2018). The amount is determined based on "the nature and amount of the victim's pecuniary loss." *Id.* § 40-35-304(b). "Pecuniary loss," in the context of this section, means "[a]ll special damages . . . as substantiated by evidence in the record or as agreed to by the defendant" and "[r]easonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense[.]" *Id.* § 40-35-304(e)(1)-(2). However, the restitution award "does not have to equal or mirror the victim's precise pecuniary loss." *State v. Smith*, 898 S.W.2d 742, 474 (Tenn. Crim. App.

1994); *see State v. Mathes*, 114 S.W.3d 915, 919 (Tenn. 2003). At the time of the sentencing hearing, the court shall specify "the amount and time of payment . . . to the victim and may permit payment . . . in installments." T.C.A. § 40-35-304(c). The court may not establish a payment "schedule extending beyond the statutory maximum term of probation supervision that would have been imposed for the offense." *Id*. "The court shall consider the financial resources and future ability of the defendant to pay" in determining restitution. *Id.* § 40-35-304(d). Moreover, "upon expiration of the time of payment or the payment schedule imposed . . . , if any portion of restitution remains unpaid, then the victim or the victim's beneficiary may convert the unpaid balance into a civil judgment[.]" *Id.* § 40-35-304(h)(1).

Upon review, we conclude as a matter of plain error that the trial court abused its discretion considering the terms of restitution. *See State v. Comer*, 278 S.W.3d 758 (Tenn. 2008) (holding that, in determining restitution, the sentencing court must consider a defendant's financial resources and ability to pay); *see also State v. Lane*, 254 S.W.3d 349, 353 (Tenn. 2008) (holding that the failure to consider a defendant's financial ability to pay restitution was a "plain and palpable abuse of discretion[.]"); *State v. Tyson B. Dodson*, No. M2018-01087-CCA-R3-CD, 2019 WL 3946097, at *3 (Tenn. Crim. App. Apr. 16, 2019) (holding that the trial court erred in failing to consider the defendant's financial resources and future ability to pay and in failing to determine the amount of restitution and the payment schedule). The trial court failed to consider the Defendant's ability to pay restitution and focused solely on the victims' pecuniary losses. Likewise, the court failed to establish a time of payment schedule, to the extent that the court may have contemplated installment payments. *See* T.C.A. § 40-35-304(c). Therefore, we reverse the trial court's restitution order because the court failed to consider the Defendant's ability to pay restitution and departed from the statutory procedure for establishing a definitive payment schedule. We remand the case for the determination of a proper restitution award, with consideration of the Defendant's financial resources and future ability to pay. *See Tyson B. Dodson*, 2019 WL 3946097, at *3 (remanding for consideration of restitution award and establishment of a payment schedule).

In consideration of the foregoing and the record as a whole, we affirm the Defendant's sentence, but we reverse the trial court's restitution order and remand the case for proper restitution determinations.

_____
ROBERT H. MONTGOMERY, JR., JUDGE