IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
October 22, 2024 Session

**STATE OF TENNESSEE v. DESMOND LANIER HATCHETT**

**Appeal from the Criminal Court for Knox County
No. 122892   Hector Sanchez, Judge**

_____

**No. E2023-01587-CCA-R3-CD**
_____

Defendant, Desmond Lanier Hatchett, was convicted by a Knox County jury of evading arrest with risk of death or injury, driving while his license was revoked, reckless driving, violation of the financial responsibility law, and violation of the window tint law.  The trial court imposed an effective sentence of six years' incarceration.  Defendant appeals, arguing that the trial court erred in imposing a six-year sentence for evading arrest with risk of death or injury.  Upon review of the entire record, briefs and oral arguments of the parties, and the applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JILL BARTEE AYERS, J., delivered the opinion of the court, in which TOM GREENHOLTZ and KYLE A. HIXSON, JJ., joined.

D.T. Christmas (at sentencing and on appeal), and Spencer Reed (at trial), Knoxville, Tennessee, for the appellant, Desmond Lanier Hatchett.

Jonathan Skrmetti, Attorney General and Reporter; Garret D. Ward, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; and Willie Lane and Randall Kilby, Assistant District Attorneys General, for the appellee, State of Tennessee.

**OPINION**

**Factual and Procedural Background**

On September 5, 2021, Knoxville Police Department ("KPD") Officer Austin Jordan was patrolling in East Knoxville when he recognized Defendant driving a red vehicle.  He was aware that Defendant had multiple felony warrants.  Officer Jordan identified Defendant in court and explained that after he confirmed Defendant's license plate number, he activated his emergency lights to initiate a traffic stop.  However,

Defendant did not stop his vehicle, and a vehicular pursuit ensued. Officer Jordan confirmed that his body worn camera and his patrol vehicle's dash camera were operational and recorded the pursuit; both videos were exhibited to his testimony.

Defendant traveled at a high rate of speed through a residential area. Officer Jordan "reached some high speeds in a [twenty-five]-mile-per-hour zone" before catching up with Defendant; the top speed he saw on the dash camera video was eighty-eight miles per hour. Officer Jordan recalled that Defendant failed to stop at seven stop signs. Officer Jordan affirmed that there were homes on both sides of the street, cars parked along the street, and traffic traveling in both directions. He explained that a vehicle traveling in the same direction as Defendant had stopped "on a blind hill, near the area where we approached the top speed and [Defendant] passed that vehicle in oncoming traffic without being able to observe" the other side of the hill. Officer Jordan affirmed that a car had just come over the hill traveling in the opposite direction immediately prior to Defendant's passing on the blind hill.

Eventually, Defendant pulled into a driveway and "bailed out" of the vehicle; Officer Jordan then engaged in a foot pursuit. When Officer Jordan lost sight of Defendant in a tree line, he slowed down and drew his firearm to ensure his safety. Shortly thereafter, Defendant exited the tree line and began "to comply with commands, had stopped, and was taken into custody without incident."

Defendant testified that he saw Officer Jordan behind him but did not stop because he knew he had outstanding warrants and did not want to go to jail. Defendant admitted that he evaded arrest but asserted that he did not put anyone at risk of injury or death. On cross-examination, Defendant denied that he traveled more than eighty miles per hour and asserted that his vehicle could not go that fast. He admitted that he had previously been convicted of aggravated assault and theft.

The jury convicted Defendant as charged for evading arrest with risk of death or injury (count one), driving while his license was revoked (count two), reckless driving (count three), violation of the financial responsibility law (count four), and violation of the window tint law (count five).

The trial court conducted a sentencing hearing on August 16, 2023. Defendant's presentence report was admitted into evidence; his criminal history made up twenty-one pages of the thirty-three-page report and spanned from age nineteen through forty-three. Defendant had thirty-three prior convictions and 140 arrests or citations, the majority of which had been dismissed. Defendant also had thirty-four disciplinary infractions while incarcerated in the Tennessee Department of Correction ("TDOC") between 2004 and 2020. Defendant reported that he did not use alcohol or illegal substances and that his

mental and physical health were "excellent." Defendant's validated risk and needs assessment resulted in a risk score of moderate with high needs in residential, moderate needs in attitudes/behaviors, aggression, and education, and low needs in mental health, alcohol/drug use, employment, friends, and family.

The State introduced certified copies of Defendant's four prior felony convictions: three convictions for aggravated assault, Class C felonies, from August 12, 2002, August 2, 2008, and August 15, 2016; and one conviction for reckless endangerment, a Class E felony, from August 12, 2002. Certified copies of Defendant's TDOC disciplinary forms were admitted into evidence and the State also introduced the transcript from Defendant's October 19, 2022, bond revocation hearing in this case. The testimony at the bond hearing established that on October 2, 2022, Defendant went to the house of a mother of his children and vandalized her vehicle by slashing all four tires, shooting a firearm into the front of the vehicle, and carving a "D" in the side of the vehicle. The trial court revoked Defendant's pretrial release and ordered him held without bond. Defendant's presentence report from 2008 was also entered as an exhibit. It included letters from three officers opposing a probationary sentence at that time due to Defendant's threats toward officers and their families.

Lieutenant Stoney Gentry worked in the Knox County Sheriff's Office ("KCSO") pretrial division. He identified Defendant in court and explained that while Defendant was on pretrial release for this case and for another case in which he had been charged with theft and stalking, Defendant violated his pretrial release conditions. Lieutenant Gentry identified multiple non-compliance reports documenting Defendant's violations; the reports were exhibited to his testimony. Lieutenant Gentry recalled that on August 11, 2022, Judge Steven Sword had him "in great detail go over the conditions once more with [Defendant] and actually had [him] escort [Defendant] to [his] office and instructed [Defendant] to report to pretrial as agreed and as the court ordered." Defendant "never" reported to Lieutenant Gentry's office after that date.

On cross-examination, Lieutenant Gentry stated that he had supervised Defendant "on numerous occasions." Defendant had not threatened Lieutenant Gentry but "would just declare that he's not going to" comply with pretrial supervision.

TDOC Probation Officer Lisa Mooneyham testified regarding Defendant's history on supervision. Officer Mooneyham met Defendant in April 2009 because Defendant's assigned probation officer was on leave. When Officer Mooneyham first met with Defendant, he reported that he had received another ticket and that he "usually" just called his assigned probation officer. Officer Mooneyham "confronted him about continuing to break the law, and he said, 'That's not breaking the law.'" She agreed that Defendant had "[v]arious violations" but his probation had only been revoked three times.

Defendant was first incarcerated in TDOC in 2002. After he was released on parole, he was found to be in violation two times in 2004 for incurring new charges; both times he was reinstated until the sentence expired. Officer Mooneyham opined that this occurred because "back then they thought that was just easier." On September 2, 2008, Defendant was convicted of aggravated assault and sentenced to six years in split confinement with credit for time served. During the period of that supervision, Defendant incurred new charges, and his probation was revoked to serve sixty days on August 6, 2009, "to help him come into compliance with supervision," and then reinstated. Then, based on a technical violation in November 2009, Defendant's probation was again revoked, and he was ordered to serve the balance of that sentence in TDOC. That sentence expired in 2014.

After Defendant's release from the 2008 aggravated assault conviction, he again picked up new charges, and in July 2016, he was again placed on probation. That probationary sentence was revoked "for new charges"[1] in March 2017, and Defendant was ordered to serve the sentence in TDOC. That sentence expired in November 2020. Officer Mooneyham recalled that there was a time that Defendant was ordered to "stay at the mission[2] as a kind of sanction" for seven days. Defendant was present during each home visit that Officer Mooneyham conducted during that time. Officer Mooneyham identified a report that documented Defendant's movement within TDOC, including his revocations; the report was admitted into evidence.

On cross-examination, Officer Mooneyham confirmed that Defendant had his probation fully revoked three times. She was unaware of the dispositions of the new charges underlying the probation violations. She testified that Defendant was never disrespectful to her nor yelled at her during the time she supervised him, but she recalled that she once told a judge that Defendant was "the most entitled offender" she had met in her ten years as a probation officer.

KCSO Captain Aaron Turner supervised the disciplinary and grievance offices at the Roger D. Wilson Detention Facility. Captain Turner identified Defendant in court and identified Defendant's KCSO disciplinary history, which was admitted into evidence. The KCSO disciplinary history showed that Defendant had sixty disciplinary infractions between August 2007 and July 2023, which included threats, resisting, abuse of privileges, headcount violation, posing as another inmate, refusing a lawful order, disruptive noise or activity, interfering with a search, security/electronic communication violation, sexual misconduct, and visitation violation. Captain Turner explained that Defendant's most recent violations were a result of Defendant's "performing sex acts" on video calls. There

---

[1] It is unclear from the record the nature or disposition of the charge(s).

[2] There is no information in the record identifying the "mission."

were "several instances" where Captain Turner "reviewed and blocked phone numbers" without charging Defendant. Captain Turner agreed that it would be fair to classify Defendant's disciplinary infractions as "a consistent refusal to obey any orders[.]"

On cross-examination, Captain Turner agreed that some of Defendant's multiple violations showed the disposition as "awaiting board hearing" and explained that could either be because Defendant left custody prior to a board hearing, or the system did not collect the disposition. Captain Turner affirmed that Defendant had "a resisting or two, but . . . no fighting [with] or assault" of a guard or deputy; he did not believe that Defendant was listed as a threat to officers. At the time of the sentencing hearing, Defendant was serving a disciplinary sanction.

KPD Investigator[3] Bernhard Braeuner identified an email he sent to Joseph Kszos in 2008 as a part of Defendant's 2008 presentence report for his sentencing hearing on the aggravated assault charge. In the email, Investigator Braeuner explained that he arrested Defendant for criminal trespassing and driving on a revoked license in February 2008. During the arrest, Defendant repeatedly informed the officers that he would continue to run from them, and "[d]uring the trip to the KPD wagon, [Defendant] said [the officers] would be shot while in uniform in Austin Homes that night." Defendant continued to threaten the officers and their families. In concluding the email, Investigator Braeuner asserted that he thought Defendant "would be a danger to the community and his arrests would continue despite his status on probation." Investigator Braeuner explained that in his almost thirty-year career as a law enforcement officer, only twice had he sent correspondence opposing a probationary sentence. On cross-examination, Investigator Braeuner explained that no charges were brought against Defendant based on his threats because of technical problems with the recording of Defendant's threats.

Jordan Hatchett, Defendant's wife, testified that she had known Defendant since October 2021, and they had been married since May 2023.[4] She explained that Defendant had twenty-seven children and that he was "doing his fatherly duties" for each of the children. Defendant had "stepp[ed] in as a father figure" to her children and was a "positive male role model" for her children. Defendant was present for important activities and holidays, as well as providing financially for the children. Mrs. Hatchett described her relationship with Defendant as "great" because he was her "best friend" and they "talk about everything." She expressed her intent to help Defendant obtain employment when he is released. Mrs. Hatchett stated that Defendant had an "excellent relationship" with his

---

[3] At the time of Defendant's sentencing, Bernhard Braeuner was a KPD detective. We will use his title at the time of his interaction with Defendant.

[4] Defendant and Mrs. Hatchett married while Defendant was in custody.

mother. On cross-examination, Mrs. Hatchett explained that Defendant helped his children financially, even those who were adults, by working "odd and end jobs[.]"

Defendant's stepdaughters, mother, and aunt each wrote letters of support; the letters were admitted as a collective exhibit. Defendant also introduced a Fiscal Memorandum from March 6, 2023, showing that the average length of incarceration for evading arrest with risk of death or bodily injury was .88 years, and a Fiscal Note from February 12, 2016, showing that the average time served at that time was 2.03 years.

Defendant gave an allocution acknowledging that he "made a huge mistake" but expressed his belief that given "all that [he's] been through in these [eleven] long months, [he] should be allowed the opportunity of being on probation." He explained he did not have problems with drugs or alcohol, that he had a job if he were to be released, and that he would not have any further problems between him and the mothers of his children because he was a "married man now." Defendant noted that he had obtained thirty-five certificates for completing various courses while incarcerated for eleven months, which were later admitted into evidence. He expressed a desire to be there for his young children and grandchildren, mother, and grandmother. Defendant denied that he was on pretrial release for the evading arrest charge at the time that many of the non-compliance reports were filed by Lieutenant Gentry.

The State argued for the maximum sentence based on Defendant's criminal history and "complete lack of compliance[.]" The State specifically noted Defendant's numerous arrests and convictions, multiple infractions while incarcerated, and his history of running from police. Regarding alignment of the sentences, the State urged the trial court to impose consecutive sentences because Defendant had an extensive criminal record and had no hesitation in committing a crime when the risk to human life was high.

Defendant urged the trial court to impose the minimum sentence within the appropriate range and to align Defendant's sentences concurrently. Defendant requested that the trial court consider three mitigating factors: that Defendant's conduct neither caused nor threatened serious bodily injury; that substantial grounds existed to excuse or justify his conduct; and that Defendant assisted the authorities in apprehending persons who committed a crime. *See* T.C.A. § 40-35-113(1), (3), (9). Defendant asserted that Officer Jordan attempted to initiate the traffic stop prior to a traffic infraction occurring, thus, excusing Defendant's flight from an illegal stop, and that Defendant assisted authorities in apprehending him because he surrendered after successfully escaping into the tree line. Defendant requested concurrent alignment of his sentences, noting that he had already served the average length of incarceration for evading arrest with risk of bodily injury, had not posed a threat to any guards while incarcerated, and had completed thirty-five courses while incarcerated.

The trial court considered the evidence presented at trial and the sentencing hearing, Defendant's presentence report, statistical information regarding sentencing practices for evading arrest with risk of bodily injury, and the purposes and principles of sentencing. The trial court found that because he had three prior Class C felonies and one Class E felony, Defendant was a Range II multiple offender. The trial court also found that Defendant had a history of criminal convictions, noting the two felony convictions not considered to establish Defendant's range, and a history of criminal behavior based upon his history of infractions while incarcerated and Investigator Braeuner's testimony regarding his interaction with Defendant in 2008. The trial gave "some degree of weight" to Defendant's history of failing to comply with the terms of his pretrial release. The trial court declined to apply any of the mitigating factors argued by Defendant.

The trial court found that Defendant was not a favorable candidate for alternative sentencing based on Defendant's "substantial criminal history," specifically noting Defendant's 140 arrests and "upwards of 100" dismissals, and because Defendant was being sentenced for "a third or subsequent felony conviction involving separate periods of incarceration or supervision[.]" *See* T.C.A. § 40-35-102(6)(A). The trial court also found that incarceration was necessary to avoid depreciating the seriousness of the offense because Defendant exposed innocent bystanders to "a great deal of danger." *See id.* § 40-35-103(1)(B). The trial court noted that this case did not garner much media attention, but that "it should go to show that if you run from the police and you put folks in danger, there should be . . . consequences [for] that conduct." The trial court found that Defendant's prior probation violations indicated that less restrictive measures had been unsuccessful. *See id.* § -103(1)(C). Finally, the trial court found that Defendant could be rehabilitated and "one of these days choose to change his behavior, but that hasn't occurred yet."

The trial court imposed a six-year sentence to serve for count one, six months each for counts two and three, and thirty days each for counts four and five, all to run concurrently, for an effective sentence of six years to serve in TDOC.

Defendant filed a timely motion for new trial, which was denied after a hearing on November 2, 2023.[5] Defendant's timely appeal is properly before this court.

---

[5] While the record does not include a written order denying Defendant's motion for new trial, the record does include the November 2, 2023 court minutes documenting the denial of Defendant's motion for new trial which is sufficient to confer jurisdiction. *See State v. Byington*, 284 S.W.3d 220, 225 (Tenn. 2005) (finding supplemental record that included court minutes indicating that the trial court had denied the motion for new trial sufficient to confer jurisdiction).

**Analysis**

Defendant appeals the length of his sentence arguing that the trial court erroneously considered his arrests as criminal behavior without making the proper factual findings and that the trial court failed to apply the mitigating factor that his conduct neither threatened nor caused serious bodily injury. Defendant does not challenge the sentences for counts two through five. The State argues that the trial court acted within its discretion by imposing a greater-than-minimum sentence after applying multiple enhancement and no mitigating factors. We agree with the State.

On appeal, the party challenging the sentence bears the burden of establishing that the sentence is improper. *State v. Branham*, 501 S.W.3d 577, 595 (Tenn. Crim. App. 2016). This court reviews sentencing decisions under an "abuse of discretion standard of review, granting a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *State v. Bise*, 380 S.W.3d 682, 707 (Tenn. 2012). "A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party." *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010) (citing *State v. Jordan*, 325 S.W.3d 1, 38-40 (Tenn. 2010)).

After determining the appropriate sentencing range, a trial court must consider any evidence received at trial and the sentencing hearing, the presentence report, the purposes and principles of sentencing, any argument for alternative sentencing, the nature and characteristics of the criminal conduct involved, evidence regarding enhancement and mitigating factors, statistical information provided by the administrative office of the court regarding sentencing practices for similar crimes, any statement the defendant makes on his own behalf, and the results of a validated risk and needs assessment. T.C.A. § 40-35-210(a), (b). Additionally, the sentence imposed shall be "no greater than that deserved for the offense committed" and "the least severe measure necessary to achieve the purposes for which the sentence is imposed." *Id.* § 40-35-103(2), (4). Because the trial court's sentencing decision was based on proper considerations, we will review it for an abuse of discretion with a presumption of reasonableness.

When adjusting the length of a sentence within the appropriate range, a trial court is guided by, but not bound by, any applicable mitigating and enhancement factors. *State v. Carter*, 254 S.W.3d 335, 344 (Tenn. 2007). It is within the trial court's sound discretion to weigh any applicable mitigating or enhancement factors. *State v. Nelson*, No. M2023-00176-CCA-R3-CD, 2024 WL 1192985, at *15 (Tenn. Crim. App. Mar. 20, 2024) (quoting *Carter*, 254 S.W.3d at 345), *no perm. app. filed.* Misapplication of a mitigating or enhancement factor does not invalidate a sentence unless the trial court wholly departed

from the sentencing act. *State v. Mosley*, No. W2022-01424-CCA-R3-CD, 2024 WL 1406156, at \*21 (Tenn. Crim. App. Apr. 2, 2024) (quoting *Bise*, 380 S.W.3d at 706), *no perm. app. filed*.

In this case, Defendant faced a sentencing range of four to eight years as a Range II multiple offender for his Class D felony evading arrest with risk of death or injury conviction. *See* T.C.A. § 40-35-106(a)(1) (defining a multiple offender as a defendant that has at least two but not more than four prior felony convictions "within the conviction class, a higher class, or within the next two (2) lower felony classes"); T.C.A. § 40-35-112(b)(4) (mandating that the sentencing range for a Range II offender convicted of a Class D felony is between four and eight years). The trial court found that enhancement factors one, Defendant's history of criminal behavior or convictions, and eight, Defendant's failure to comply with the conditions of a sentence involving release into the community, were applicable and imposed a mid-range sentence of six years' confinement. *See id.* § 40-35-114(1), (8).

At oral argument Defendant asserted that he was challenging both the length of the sentence and the manner of service. However, the issue as presented in Defendant's brief was: "Whether the trial court's decision to sentence the defendant to a period of confinement for six (6) years should be upheld where the most heavily weighed enhancement factor was not properly applied and an applicable mitigating factor was not considered at all?" In the argument section of his brief, he states, "The length of the sentence for Count One fails to comply with the purposes, principles, and application of the Sentencing Act." In his conclusion, Defendant makes a statement which could arguably be read as a challenge to the manner of service; however, the remainder of his brief focuses solely on the length of the sentence. Defendant does not cite to the portion of the record containing the trial court's findings regarding confinement and does not provide argument, supported by appropriate legal authority, regarding the manner of service. *See* Tenn. R. App. P. 27(a)(7), (g), (h); Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."). Further, this court has recently cautioned that an appellant who broadly asserts error in an issue statement, particularly in sentencing, risks having the issues waived. *State v. Francis*, No. M2022-01777-CCA-R3-CD, 2024 WL 4182870, at \*4 (Tenn. Crim. App. Sept. 13, 2024) ("[T]he [d]efendant's single broad issue essentially challenges both the length of his ten-year sentence and the manner of its service. These are separate sentencing considerations, of course, as they represent separate exercises of a sentencing court's discretion."), *no perm. app. filed*. Defendant has not properly raised a challenge to the manner of service of the sentence.

Regarding the length of the sentence, Defendant contends that the trial court improperly considered multiple arrests which did not result in convictions. Under

Tennessee Code Annotated section 40-35-114(1), a defendant's history of criminal behavior or convictions may be used to enhance a sentence within the appropriate range. "[M]erely being arrested or charged with a crime is not 'criminal behavior' within the meaning of the statute." *State v. Carico*, 968 S.W.2d 280, 288 (Tenn. 1998) (citations omitted). Thus, a trial court may not enhance a sentence based upon arrests or acquitted offenses unless the facts underlying the arrest or acquitted offenses have been established by a preponderance of the evidence. *State v. Winfield*, 23 S.W.3d 279, 283 (Tenn. 2000); *see State v. Brown*, No. W2022-01188-CCA-R3-CD, 2023 WL 6459814, at *9 (Tenn. Crim. App. Oct. 4, 2023) (stating that the State must prove the criminal conduct by a preponderance of the evidence prior to a trial court applying enhancement factor one), *perm. app. denied* (Tenn. Mar. 6, 2024).

We note that each of the trial court's statements regarding Defendant's arrest history about which Defendant complains were made at the hearing on the motion for new trial, not at the sentencing hearing. At the hearing on the motion for new trial, the trial court stated that "a lot of [Defendant's] arrests did not amount or result in convictions, but if . . . you're subject to being arrested over a hundred times, you certainly have a history, a serious history of criminal conduct[.]" However, in considering enhancement factor one at the sentencing hearing, the trial court stated only its consideration of Defendant's two felony convictions not used to establish his sentencing range, Investigator Braeuner's testimony regarding Defendant's threats in 2008, and Captain Turner's testimony regarding Defendant's disciplinary history while incarcerated. The trial court later, in considering whether to order incarceration, found that Defendant had a "substantial criminal history," and noted Defendant's arrests and dismissals. Our review of the record reflects that the trial court did not consider Defendant's history of arrests in applying enhancement factor one.

Further, even had the trial court considered Defendant's history of arrests, Defendant concedes that the record fully supports the trial court's application of enhancement factor one based on his two felony and approximately twenty-nine misdemeanor convictions. Thus, the trial court did not abuse its discretion in applying enhancement factor one. Defendant is not entitled to relief on this basis.

Next, Defendant contends that the trial court erred in not applying mitigating factor one because Defendant's "conduct neither caused nor threatened serious bodily injury[.]" He asserts that the dash camera video shows that Defendant maintained his lane, used his turn signal, lowered his speed at stop signs, that oncoming traffic did not have to swerve, and that there was no risk of Defendant striking the bystanders standing away from the road in their yards. A claim that the trial court improperly weighed a mitigating factor is not a ground for appeal after the 2005 amendments to our sentencing act. *Carter*, 254 S.W.3d at 344. Thus, while the trial court should consider mitigating evidence put forth

by a defendant, it is within the trial court's discretion to determine what weight, if any, it assigns to such mitigating evidence. *See State v. Jackson*, No. W2021-00208-CCA-R3-CD, 2022 WL 370090, at *4 (Tenn. Crim. App. Feb. 8, 2022) (noting that the trial court should have considered the mitigating evidence even if it ultimately assigned no weight to it), *no perm. app. filed*.

Here, the trial court considered this mitigating factor but refused to apply any weight to it because Defendant traveled at "a very high rate of speed" in a residential area, disregarded stop signs, and "crest[ed] a hill and almost made contact with another motor vehicle." The evidence presented at trial supports the trial court's determination that Defendant created a risk of serious bodily injury by driving in this manner. Further, even if the trial court had improperly refused to apply this mitigating factor, it was within the trial court's discretion to impose a mid-range sentence based upon its proper application of enhancement factors one and eight. *See State v. Henderson*, No. W2022-00882-CCA-R3-CD, 2023 WL 4105937, at *4-5 (Tenn. Crim. App. June 21, 2023) (holding that any failure to apply mitigating factor one did not warrant relief because the trial court applied three enhancement factors before imposing the maximum within-range sentence), *no perm. app. filed*. Defendant is not entitled to relief.

## CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.

_____
JILL BARTEE AYERS, JUDGE

- 11 -